## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| CAN SOFTTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 24-1009 |
| | ) | |
| v. | ) | Filed: July 17, 2025 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: July 29, 2025* |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff CAN Softtech, Inc. ("CSI") challenges the General Services Administration's ("GSA" or "the Agency") decisions first to reevaluate quotes under a solicitation for information technology support services for the United States Air Force and then to terminate CSI's award in order to re-solicit the requirement under a revised solicitation. It also challenges GSA's sole-source extension of the incumbent's contract. CSI argues that GSA's rationale for initially reevaluating the award is unexplained, while GSA's later cancellation and re-solicitation decision lacks a rational basis and any reasonable explanation. CSI contends GSA's sole-source extension is both contrary to law and arbitrary and capricious. Before the Court are the parties' dispositive motions and CSI's Motion to Strike. As explained below, the Court **GRANTS IN PART AND DENIES IN PART** CSI's Motion for Judgment on the Administrative Record, **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record, **DENIES** CSI's Motion to Strike, and **REMANDS** to the Agency for further explanation of its decision to terminate CSI's contract award and re-solicit.

---

* The Court issued this opinion under seal on July 17, 2025, and directed the parties to file any proposed redactions by July 24, 2025. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

# I.    BACKGROUND

## A.    The Solicitation

On August 15, 2023, GSA issued Request for Quote No. 47QFLA23Q0116 ("RFQ" or "the Solicitation") for the award of a task order for eFINANCE, LeaveWeb, FMSuite, and FMDQS (collectively, "ELFF") information-technology support services to be provided by the contractor to the Air Force.  Admin. R. ("AR") at 66, 155, ECF No. 19-1.[1]  GSA issued the Solicitation pursuant to the authority of Federal Acquisition Regulation ("FAR") 8.405, under GSA's Multiple Award Schedule – Small Business, and classified the Solicitation as a small business set-aside.  *Id.* The Solicitation indicated that GSA would award a single task order with Firm Fixed Price and Time and Material/Labor Hour line items.  *Id.*  GSA noted that the phase-in period would begin on January 1, 2024, and that the base year of the task order was February 1, 2024, to January 31, 2025.  *Id.*  The Solicitation included four additional option years, continuing through January 31, 2029.  AR 67.  The Solicitation initially closed on September 6, 2023, which is when quotes were due.  AR 155.  After some amendments to correct "discrepancies" and to revise certain other requirements, GSA extended the due date to September 15, 2023.  AR 160.

GSA notified offerors that its evaluation of quotes would be conducted using the best-value tradeoff approach.  AR 81.  The Solicitation indicated that GSA would consider several factors in its evaluation, as well as compliance with mandatory requirements (pass/fail).  AR 70–85.  GSA further attached to the Solicitation a Performance Work Statement ("PWS") that defined additional

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.  The original Administrative Record includes pages 1–781 (ECF No. 19-1), an amendment with additional documents not provided in the original record includes pages 782–948 (ECF Nos. 27-1, 46-2), and an amendment with redacted copies of documents reviewed in camera includes CSI-IC 1–87 (ECF No. 42-2).  The Court will collectively refer to all parts as the Administrative Record or "AR".  Citations to the documents provided in camera use the separately paginated bates-labeled page numbers, *i.e.*, the page numbers following "CSI-IC".

requirements for the contract. AR 89–132. The PWS laid out a set of 33 deliverables that GSA and the Air Force expected contractors to provide following contract award, including items like a Quality Management Plan due 30 days after contract start and a Monthly Status Report due no later than the tenth day of each calendar month following commencement of the contract. *See* AR 114–16.

As relevant to this lawsuit, the Solicitation provided an estimate for staffing requirements, indicating that the Agency expected staffing for approximately one year to require 12 full-time equivalent positions supported by an estimated 45,120 labor hours. AR 68. In response to an offeror's question about the mismatch between the estimated number of full-time employees and the estimated labor hours (45,120 labor hours suggests a total of 24 full-time positions in a year, not 12), GSA later clarified—before the final due date for quotes—that the original Solicitation was incorrect and the estimate for staffing levels should total 24 full-time positions. AR 228.

The Solicitation required offerors to "provide evidence (certificate) that key personnel possess the required certifications in compliance with the PWS paragraph 7.5 Key Positions/Key Personnel." AR 71. That paragraph specified, in turn, that

> [k]ey personnel are personnel proposed to perform in key positions. Key positions are those deemed essential for successful contractor accomplishment of the work to be performed. The contractor shall not divert key personnel to other projects or replace them without receiving prior authorization from the Contracting Officer (CO). All key positions require a bachelor's degree and 3-5 years of experience. A minimum of 5 years of specialized experience relevant to the key position is required to substitute work experience or education.

AR 123. The PWS identified two positions that GSA considered to be key positions: a Project Manager and a Lead Developer. AR 123–24. GSA required the Project Manager to "have credentials that substantiate that he or she" has significant project experience, successful management of project tasks, experience in managing teams on a Department of Defense contract,

and knowledge of Air Force management practices and program implementation. *Id.* GSA required the Lead Developer to have expert knowledge in "Full Stack SDLC"; "SQL stored queries, procedures, functions, views, and triggers"; "SQL database modeling, constraints, indexes"; HTML; JavaScript; CSS; Java; Build Tools; and Configuration Management. AR 124.

Though cybersecurity certifications were not referenced directly in the Solicitation, GSA included a section in the PWS noting that

> [t]he contractor shall provide personnel who are fully qualified to perform the requirements in the PWS. All contractor personnel must possess and apply comprehensive knowledge on multiple complex tasks and high impact assessments. Tasks require personnel to have the knowledge, skills, and abilities to determine innovative solutions to complex requirements. All personnel in information technology positions must meet certification requirements identified in section 9.1.1 of this PWS.

AR 122. Section 9.1.1 required offerors to comply with Defense Acquisition Regulation Supplement 252.239-7001, which in turn requires contractors to undergo training and possess certification for information assurance functions applicable to Department of Defense contracts. AR 129. The PWS included a variety of additional requirements related to certifications in information assurance and cybersecurity. AR 129–30.

The Solicitation also included a requirement that offerors "fill out and submit the [Cyber-Supply Chain Risk Management] Questionnaire" attached to the Solicitation to address "the offeror's baseline ability to identify, manage and mitigate supply chain and cybersecurity risk." AR 71. The questionnaire included assessments related to the fortification of an offeror's hardware, firmware, and software against component substitution, functionality alteration, and malware insertion. *Id.* It further requested information from offerors about how they would "maintain a high level of cybersecurity" and risk management "readiness" in providing information technology services to federal customers. *Id.*

In addition to the pass/fail requirements, the Solicitation identified four evaluation factors that GSA would use to assess quotes. Factor 1 concerned an offeror's technical approach. AR 72. GSA described the evaluation criteria to assess that factor as follows:

| Color | Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

AR 72. The Solicitation required offerors to "provide a written technical approach that describe[d] how they will accomplish all tasks and requirements within the PWS." *Id.* Beyond generally referencing "all" tasks and requirements in the PWS, the Solicitation contained no additional insight on how GSA would assess quotes under Factor 1. *See id.* The PWS, among other requirements, included a list of six objectives for offerors to satisfy:

- Design, code, unit test, formal test, and implement [Business Enterprise Architecture]/[Standard Financial Information Structure] as required and Cloud Computing ELFF requirements.
- Provide software maintenance, enhancement, and sustainment support for ELFF.
- Provide training documentation used to develop training materials for ELFF.

5

- Provide second and third tier Help Desk support for the functional and technical user community.
- Operate, maintain, and administer system in a virtual environment, current operating system (OS), database (DB), web server (WS) and utility software.
- Not cross utilize personnel between firm fixed prices tasks and labor hour tasks.

AR 95.

Factor 2 concerned offerors' staffing approach. AR 72. The Solicitation required offerors to "describe their staffing approach" for completing tasks outlined in the PWS, including, "at a minimum," a "narrative addressing the contractor's staffing approach specific to the [ELFF] requirements." *Id.* The narrative was to include "proposed labor categories, with education and experience descriptions, and level of effort." *Id.* GSA required offerors to submit a project staffing plan that identified all proposed individuals working on the contract, with "key personnel" to be identified as such and available to begin work immediately. AR 73. The Solicitation required offerors to submit resumes for the two key positions identified above: Project Manager and Lead Developer. *Id.*

Factor 3 concerned offerors' relevant experience and past performance on government contracts. AR 75. The Solicitation noted that the "evaluation [would be] based on the offeror's record of recent, relevant, and quality of present and past performance information that pertains to this effort." *Id.* GSA directed "[r]equired information" to be "provided in the past/present performance questionnaire" attached to the Solicitation. *Id.* That questionnaire asked each offeror's references to rate various aspects—across nine metrics—of the offeror's performance on past contracts. AR 136–37. The questionnaire asked references to use a six-point scale: (1) excellent, (2) very good, (3) satisfactory, (4) marginal, (5) unsatisfactory, and (6) not applicable. AR 136. Questions concerned (1) personnel with experience and education; (2) effectiveness in meeting workloads; (3) effectiveness in resolving problems; (4) professionalism; (5) adherence to

deadlines and cost estimates; (6) clarity of written work product; (7) the existence of discrepancies; (8) overall satisfaction; and (9) whether the reference would do business with the contractor again. AR 137.

The Solicitation indicated it would consider each offeror's experience as a prime contractor or subcontractor on similar contracts "of at least $2 million per year within the last three (3) years prior to issuance of the [S]olicitation." AR 75. Similar contracts, per the Solicitation, included any contract involving software development, maintenance, and integration and "at least one of the following additional work characteristics:" systems administration, database administration, or information technology "Help Desk." *Id.*

The Solicitation contained criteria outlining what kinds of past experience GSA would consider and how GSA would evaluate the relevancy of that experience. AR 76–77. GSA required offerors to submit "past and present performance for three active or completed contracts, two of which the contractor must have served as the prime." AR 76. GSA indicated that it "may consider any other information it receive[d] for validation of the Contractor's experience under this Factor." *Id.* The Solicitation provided that GSA would more heavily weight past experience—either positive or negative work experience—that it assessed to be more closely related to the scope of work in the Solicitation. *Id.* It further included a list of datapoints that offerors had to include in submissions, like the agency that issued the contract, points of contact, the type of contract, and the contract value. *Id.* And it provided a list of adjectival ratings it would use to rate each past performance example's relevancy: (1) "Very Relevant," (2) "Relevant," (3) "Somewhat Relevant," and (4) "Not Relevant." AR 77.

The Solicitation further explained how GSA would assess the recency of offerors' past-performance information. AR 77–78. "To be recent, the effort [had to] be ongoing or must have

been performed during the past three years from the original date of issuance" of the Solicitation. AR 77. "For ongoing efforts, the effort must have been in place at least nine months prior to the quote due date." *Id.* Under GSA's metrics, a past performance example could either be "Recent," *i.e.*, within the last three years of the date of the Solicitation, or "Not Recent." AR 78.

GSA explained that it would "assess the quality of performance" for each "recent, relevant effort" that each offeror submitted. *Id.* The Agency indicated it "may consider a variety of sources to determine the quality of a contractor's past performance." *Id.* Such sources might include responses to the questionnaires that offerors submitted from their project references, data from the Contractor Performance Assessment Reporting System, and communication with the points of contact that offerors listed in their past-performance questionnaires. *Id.* The Solicitation indicated that GSA would use a five-point adjectival scale to rate the quality of past performance: "Substantial Confidence," defined as a "high expectation that the offeror will successfully perform the required effort"; "Satisfactory Confidence," defined as a "reasonable expectation" of success; "Limited Confidence," a "low expectation" of success; "No Confidence," or "no expectation" of success; and "Unknown Confidence (Neutral)," which indicated that the record was "so sparse" that "no meaningful confidence assessment rating" could be assigned. AR 78–79.

The "Basis of Evaluation" for the past performance factor, GSA explained, would be the "demonstration of relevant work experience" illustrated by performance "as a Prime Contractor or as a subcontractor on at least three (3) Similar Contracts/Task Orders within the last three (3) years prior to issuance of the [S]olicitation." AR 79. The Solicitation indicated offerors might be "evaluated more favorably to the extent that they demonstrate" performance on more than three similar contracts or if certain similar contracts had more than one "additional characteristic[]" similar to the Solicitation. *Id.*

### B.    Evaluation and Initial Award

Seven firms, including CSI, submitted quotes in response to the Solicitation.  *See* AR 500. The offerors also included Octo Metric, LLC, a small-business joint venture between Malik Consulting, Inc. and the incumbent contractor, Octo Consulting Group LLC ("Octo Consulting"), which was acquired by International Business Machines ("IBM").  *See* AR 336, 500, 884.

A technical evaluation board ("TEB") consisting of two GSA and three Air Force employees evaluated the quotes and documented its final conclusions in a Non-Price Factor Consensus Report.  AR 500–01; *see* AR 434–90.  The TEB assigned CSI's proposal an "Outstanding" rating, the highest rating, on Factor 1: Technical Approach, noting that the proposal indicated an "exceptional approach" and "understanding of the requirements."  AR 501.  The TEB also assigned CSI's proposal an "Outstanding" rating for Factor 2: Management & Staffing Plan. *Id.*  And the TEB assigned CSI's proposal "Relevant / Substantial Confidence" for its past-performance submissions under Factor 3, indicating that CSI's past performance "involved similar scope and magnitude of effort and complexities" that the Solicitation required.  *Id.*  Octo Metric received exactly the same ratings on all three factors.  AR 502.

In the award decision, the GSA Contracting Officer ("CO") noted that the TEB gave CSI's Factor 1 proposal numerous strengths and only one weakness: "No mention of team expansion." AR 504.  The TEB assigned no weaknesses for CSI under Factors 2 or 3.  AR 504–05.  The TEB's evaluation of Octo Metric's quote also highlighted numerous strengths, no weaknesses under Factors 2 or 3, and only one weakness under Factor 1: "No mention of Audit.  FMS is an auditable system and therefore needs a plan."  AR 506.  The lowest-priced offeror—neither CSI nor Octo Metric—did not receive the highest technical ratings, so the CO determined that it would be in the best interest of the Government to conduct a best-value analysis between the highest-rated offerors: CSI and Octo Metric.  AR 510–11.  After balancing the quotes against each other, the CO

recommended CSI for award, noting that Octo Metric's price was higher than CSI's.  AR 511.
Given that CSI "was ranked the highest on their non-price factors and had a lower overall proposed
price than Octo Metric," the CO determined it was "in the Government's best interest to pay
12.04% or $2,912,850.00 less for the added benefits" of CSI's proposal.  *Id.*  GSA formally
awarded the task order to CSI on January 2, 2024.  AR 544.

## C.    Incumbent Protest at the GAO and Agency Corrective Action

On January 12, 2024, Octo Metric challenged the award to CSI by filing a protest before
the United States Government Accountability Office ("GAO").  AR 576.  Octo Metric raised a
bevy of claims, arguing that GSA had, as a general matter, conducted an unreasonable evaluation
of quotes that was inconsistent with the stated evaluation criteria.  *See* AR 622.

Specifically, Octo Metric argued that (1) GSA failed to evaluate performance on its
incumbent task order, which was the immediate precursor to the task order contemplated by the
Solicitation and was Octo Metric's most highly relevant and high-quality reference, *see* AR 595–
600; (2) GSA failed to evaluate "each project submitted" by Octo Metric, as the Solicitation
indicated the Agency might do, choosing to evaluate only three of the five projects the firm
submitted, *see* AR 600–02; (3) GSA failed to afford additional weight for past performance that
was more closely related to the scope of work in the Solicitation, *see* AR 602; (4) GSA failed to
evaluate Octo Metric more favorably for submitting more than three similar past contracts, *see* AR
602–03; (5) GSA failed to evaluate Octo Metric more favorably for submitting similar contracts
with more than three of the similar work characteristics outlined in the Solicitation, *see* AR 603;
(6) GSA failed to evaluate the "underlying merits of quotations" under Factor 3 (past
performance), focusing instead on generating adjectival ratings, *see* AR 604; (7) GSA improperly
determined that CSI's similar contracts were of equivalent relevance to Octo Metric's submitted
contracts, *see* AR 604–06; (8) GSA's allegedly improper evaluation of Factor 3 prejudiced Octo

Metric because, it argued, GSA would have selected its quote for qualitative benefits it offered over CSI, *see* AR 606–07; (9) GSA improperly assessed one weakness and "ignored" seven strengths that its proposal offered over CSI's under Factor 2 (staffing approach), *see* AR 607–12; (10) GSA improperly ignored "at least one" weakness in CSI's proposal under Factor 2, *see* AR 612–13; (11) GSA's allegedly improper evaluation of Factor 2 prejudiced Octo Metric because there was, per Octo Metric's protest, a reasonable possibility that the Agency would have determined Octo Metric's proposal was qualitatively superior under Factor 2, *see* AR 613; (12) GSA improperly assessed one weakness and ignored two strengths in Octo Metric's proposal under Factor 1 (technical approach), *see* AR 613–16; (13) GSA failed to account for multiple weaknesses in CSI's proposal under Factor 1, *see* AR 616–18; (14) the Agency's allegedly improper evaluation of Factor 1 prejudiced Octo Metric because its qualitative benefits could have prevailed, *see* AR 618–19; (15) GSA failed to properly evaluate price proposals because CSI's proposal failed to show it demonstrated a clear understanding of the nature and scope of the work required without any pricing risk, *see* AR 619–20; and (16) GSA conducted an improper best-value tradeoff decision by failing to consider the underlying merits of each quotation, beyond the adjectival ratings it assigned to each proposal, and failed to document the rationale for its award decision beyond assigning "identical adjectival ratings" and referencing CSI's "lower price," *see* AR 620–22.

On January 17, 2024, five days after Octo Metric filed its protest with the GAO, GSA suspended performance of CSI's contract—effective January 16—pursuant to its rules governing automatic stays. *See* AR 570–73. On January 27, 2024, GSA notified the GAO that "after reviewing the above referenced protest from Octo Metric LLC," it had "decided to take corrective action." AR 765. GSA indicated that it would "re-evaluate proposals reasonably and in

accordance with the stated evaluation criteria and issue a new award decision that is reasonable and consistent with the terms of the RFQ." *Id.* Based on that representation, the GAO dismissed Octo Metric's protest as moot on January 31, 2024. AR 766. Soon thereafter, GSA issued a sole-source bridge extension of the incumbent contract, extending Octo Consulting's then-existing task order under GSA's Alliant Small Business GWAC through January 31, 2025, to avoid a gap in services in light of Octo Metric's GAO protest. *See* AR 934–39; *see also* AR 944–48 (Amended Justification). The length of the extension took into account time for GAO to issue a decision, but also the potential for corrective action or cancellation and re-competition of the procurement. AR 939, 944–45. According to its terms, however, "[u]nder no circumstances" could the extension go "beyond one year, unless an additional justification [was] completed." AR 939; *see* AR 945.

The CO later documented the Agency's reasons for terminating CSI's contract in a Determination & Findings Memorandum ("D&F Memo"). *See* AR 771–75. Per that memorandum, after the GAO dismissed Octo Metric's protest, the Agency established a new technical evaluation board ("new TEB") to reevaluate proposals. *See* AR 773. The new TEB's evaluation work kicked off on February 5, 2024. *Id.* The new TEB and the Air Force conducted reevaluations until March 22, 2024. *Id.* "During the re-evaluation, questions regarding the RFQ and PWS [were] discussed, i.e. Mandatory Requirements, Past Performance Evaluation, Required Certifications, and Deliverables." *Id.* Starting on March 15, 2024, GSA employees began their review of the revised evaluation reports. *See id.* From then until April 4, 2024, GSA and the Air Force discussed "vagueness found within the RFQ and areas within the PWS that would need to be revised to remove deliverables." *Id.* From April 5, 2024, until April 26, 2024, the GSA contracting team engaged in "[d]iscussions" with Air Force and GSA leadership "regarding Termination of Convenience and re-solicitation." *Id.*

In mid-April 2024, the CO initiated an inquiry into potential Procurement Integrity Act violations related to the Solicitation.  *See* AR CSI-IC 3.  GSA and the Air Force conducted an internal investigation that, by May 28, 2024, revealed no "substantive evidence to indicate a clear violation of the Procurement Integrity Act."  AR 780.  Going forward, the Air Force intended to establish a new team to conduct technical evaluations and confirmed that only the CO would serve as the point of contact for offerors bidding on the Air Force's ELFF contract.  *See id.*

On June 25, 2024, following completion of the internal investigation, the CO finalized the D&F Memo providing justifications for terminating CSI's award.  *See* AR 771.  That memorandum provided a list of reasons that, in the CO's view, supported termination and re-solicitation of ELFF services for the Air Force.  AR 773–74.  Those reasons were:

- Outdated PWS and Certification Requirement Ambiguities: The [Air Force] office disclosed that the PWS is outdated and revisions to the CDRLs/Deliverables need to be made.  In addition, the certifications requirements were not clearly identified and carried over to the RFQ.
- Ambiguities found within the Request for Quote:
  - RFQ 1.9, Estimated Staffing Requirements: Further clarification needed regarding the relationship between the 12 Labor Categories and the 24 full time equivalent positions estimated to perform this requirement.
  - RFQ 3.1.3, Mandatory Requirement 3, Required Certifications: Original RFQ and Q&A document did not provide the correct cybersecurity certification requirement references.  The RFQ & PWS need[] to be clearer on exactly what certifications are required.
  - RFQ 3.1.6, Mandatory Requirement 6, Cyber Supply Chain Risk Management (C-SCRM) Compliance: This should not be a mandatory requirement.  Instead, the contractor should include it as an attachment for non-price factors in their proposal to show C-SCRM compliance.
  - RFQ 3.2 Evaluation Factor 1 – Technical Approach: Original RFQ was too vague on identifying specific requirements within the RFQ Recommend identifying specific subfactors so both contractor and TEB members can succinctly respond to and evaluate.
  - RFQ 3.2.3, Factor 1 Basis of Evaluation: Revise the language to directly link the responses to the seven (7) PWS objectives outlined in RFQ 3.2.1.
  - RFQ 3.3 Evaluation Factor 2 – Management & Staffing Approach: Clearly establish the certification requirements throughout this factor

by incorporating verbiage to demonstrate the immediate removal of an offeror's proposal if any of the items therein are missing[.] Additional clarification is required to identify the requirements relating to the expansion of personnel positions.

o   RFQ 3.4, Evaluation Factor 3 –Past Performance & Experience: Completely revise the language to clearly identify what is required and how it is to be evaluated.  Incorporate the utilization of Recent, Relevant Experience Data Sheets to standardize the offeror's reference submissions.  Clarify the past performance references for offerors as Prime Contractor vs. a Subcontractor as well as those references submitted on behalf of their subcontractor(s) for the current ELFF requirement.

o   RFQ 3.4.1, Past Performance Relevancy: Incorporate subfactor criteria to clearly identify the requirements to the contractor and TEB to evaluate, i.e. clear Size and Scope definition.

o   RFQ 3.4.2, Past Performance Recency: Incorporate a subfactor criteria to clearly establish the distinction between other past performance subfactors ergo the contractor can clearly demonstrate in their proposal and TEB evaluations.

o   RFQ 3.4.3, Past Performance Confidence: Clearly identify the medium in which the subcontractor is to provide this information and how to submit it, i.e. with their proposal submission vs. having other Government agencies directly email the GSA Contracting Officer.

o   RFQ 3.4.6, Past Performance Basis of Evaluation: Clearly outline how the Government is going to evaluate the performance of the offeror's proposal vis-a-vis their Relevancy, Recency, and Confidence.

o   RFQ 3.4.8, "more favorability ratings", recommendation to expand on how these ratings will be conducted.  The Government did not apply this factor during the technical evaluations.  Clearly identify the quality of the past performance submissions with the confidence ratings.

AR 773–74.  Based on those findings, the CO found it was in the Government's "best interest to revise the outdated PWS to remove certain deliverables and Contract Data Requirement Lists (CDRLs), and to clearly identify certification requirements."  AR 774.  The CO further found it was in the Government's best interest to revise the Solicitation "and incorporate language to clearly identify the requirements and basis of evaluation for all factors and subfactors."  *Id.*  The goal, per the CO, was to provide contractors "succinct criteria to compile their proposal" and to provide evaluators "clear and objective information to assess and evaluate" quotes.  *Id.*

On the same day—June 25, 2024—GSA formally notified CSI that it had fully terminated the awarded task order and that CSI should cease any work it had begun on the contract.  AR 778.

### D.    CSI's Present Bid Protest

CSI filed this action on July 1, 2024.  *See* Pl.'s Compl., ECF No. 1.  GSA agreed to voluntarily stay termination of the award to CSI and re-solicitation of the ELFF requirement pending completion of the protest.  *See* Gov't's Mot. to Dismiss & Cross-Mot. for J. on Admin. R. at 14, ECF No. 50.  The Court entered an initial Scheduling Order on July 10, 2024, setting deadlines for filing the Administrative Record and dispositive motions.  *See* Order, ECF No. 12.

On August 18, 2024, before the Government filed the Administrative Record, CSI moved to complete the record, asking the Court to order the Government to provide all "[i]nternal correspondence, including emails and memoranda, that reflect GSA's contemporaneous decision-making in announcing corrective action" and related to "its decision to terminate" CSI's contract.  CSI's Mot. to Complete Admin. R. at 2, ECF No. 18.  While briefing that Motion, CSI filed its First Amended Complaint on August 28, 2024.  *See generally* ECF No. 23.  The Court then stayed dispositive-motion briefing until it resolved CSI's Motion to Complete.  *See* Order, ECF No. 26. The Court largely denied that motion on October 1, 2024, but ordered in camera review of an internal GSA memorandum outlining the factual background of the Agency's investigation into the alleged Procurement Integrity Act violations.  *See* Op. & Order, ECF No. 32.  The Court denied CSI's Motion for Reconsideration (ECF No. 36) of that order on December 20, 2024, and on January 31, 2025, ordered the Government to produce a redacted copy of the GSA memorandum. *See* Op. & Order, ECF No. 39; Op. & Order, ECF No. 41.

Pursuant to the Court's revised Scheduling Order (ECF No. 44), the parties resumed dispositive briefing.  On March 31, 2025, CSI filed its Second Amended Complaint, *see* ECF No. 48, and its Motion for Judgment on the Administrative Record, *see* ECF No. 47.  CSI argues that

(1) GSA's corrective action—both the initial reevaluation and eventual cancellation—was arbitrary and capricious and contrary to law, lacking any rational justification for the action, ECF No. 47 at 21–32; and (2) GSA's continued sole-source extension of the incumbent's contract violates applicable law because, in part, the contract appears to be in effect past the January 31, 2025 expiration date identified in GSA's justification, *see id.* at 33–36. The Government filed its Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record on April 25, 2025. *See* ECF No. 50. CSI responded on May 9, 2025. *See* Pl.'s Resp. & Reply, ECF No. 51. The Government replied on May 28. *See* Gov't's Reply, ECF No. 52.

Notably, the Government attached two exhibits to its Reply indicating that, contrary to CSI's position, GSA issued a new sole-source task order on January 31, 2025, for the services at issue in this bid protest. *See* Attachs. to Gov't's Reply at 2, ECF No. 52-1. GSA issued the task order to IBM under IBM's existing GSA ALLIANT 2 contract. *See id.* at 4. IBM was the awardee because it acquired Octo Consulting, the incumbent on the contract, in December 2022, and Octo Consulting officially became IBM on January 1, 2025. *See id.* at 11. Due to the continued litigation of CSI's protest in this Court, GSA indicated that it did not expect to have resolution of CSI's claims for months, thus necessitating a 12-month bridge task order to support the timely provision of ELFF services to the Air Force. *See id.* at 10–11. The contract between GSA and IBM is in effect until January 31, 2026, factoring in the six-month option period contemplated in the award. *See id.* at 2–4.

Just before oral argument, CSI moved to strike the attachments to the Government's Reply and any portions of the Reply that rely on those attachments, arguing that the Government should have sought leave to supplement the Administrative Record, rather than introducing new documents for the first time in a reply brief. *See* Pl.'s Mot. to Strike at 2–3, ECF No. 53. The

Government responded, arguing that it had submitted the attachments as evidence intended to resolve a threshold jurisdictional issue as to CSI's second substantive claim challenging the sole-source extension of the incumbent contract, not as record evidence intended to be considered under the review standard articulated in the Administrative Procedure Act ("APA"). *See* Gov't's Resp. to Pl.'s Mot. to Strike at 1, ECF No. 56. The parties appeared for oral argument on June 10, 2025. *See* Min. Entry (June 10, 2025). The parties' outstanding motions are ripe for resolution.

## II.   LEGAL STANDARDS

### A.   Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record. Ruling on such a motion compares to an "expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The standard for judgment on the administrative record is "narrower" than the standard for summary judgment, asking, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [agency action] was not in accordance with law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007). Therefore, unlike under the summary-judgment standard, a genuine dispute of material fact does not preclude the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, confers on this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Act requires this Court to review the agency's action "pursuant to the standards set forth" in the APA. *Id.* § 1491(b)(4); *see*

*Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Accordingly, the Court asks whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 & n.5 (Fed. Cir. 2001). To prevail, a bid protestor "must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Under the APA standard, an agency action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.

Government contracting officers are given broad discretion in their procurement duties. When a contracting officer makes a reasonable decision within the scope of that discretion, this Court "may not substitute its judgment for that of the agency." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)). A protestor "bears a heavy burden" to overcome the presumption of regularity the Court affords to an agency decision. *Impresa*, 238 F.3d at 1338. And such a decision is sustainable if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* at 1333.

## III. DISCUSSION

CSI challenges several aspects of GSA's procurement under the Solicitation. It first challenges the Agency's decision to take corrective action following Octo Metric's GAO protest by reevaluating quotes submitted in response to the Solicitation, and then terminating CSI's award

for convenience in order to re-solicit the ELFF requirement.  CSI alleges that the corrective action lacks a rational basis and is thus arbitrary and capricious.  CSI next challenges GSA's sole-source extension of the incumbent contract as contrary to law, alleging that the extension violates the Competition in Contracting Act of 1984 ("CICA"), 41 U.S.C. § 3301 *et seq.*, and the FAR.  CSI also contends the extension of the incumbent contract is arbitrary and capricious for, among other things, remaining in effect even while the terms of the extension suggest it expired in January 2025.

Taking the issues in reverse order, the Court rejects CSI's challenge to GSA's sole-source extension, finding that the Agency's current sole-source task order to IBM renders that challenge moot.  But the Court sustains in part CSI's protest of GSA's corrective action, finding that GSA's justification for cancelling CSI's award and re-soliciting the ELFF requirement lacks an adequate explanation.  Remand without vacatur is therefore appropriate for GSA to provide a clear and rational explanation underlying its determination that the Solicitation is outdated, contains ambiguities, needs clarification, and thus requires cancellation and re-solicitation.

## A.   CSI's Challenge to the Sole-Source Extension of Octo Consulting's Contract Is Moot.

In its Second Amended Complaint and dispositive motion, CSI challenged GSA's decision to issue a sole-source extension of Octo Consulting's then-existing task order to avoid a gap in services pending Octo Metric's GAO protest.  *See* ECF No. 48 ¶¶ 121–26; ECF No. 47 at 33–36.  CSI argued that GSA's justification for that extension was contrary to CICA and arbitrary and capricious, both independently and because it flowed from GSA's allegedly arbitrary and capricious decision to take corrective action.  *See* ECF No. 47 at 35–36.  In response, the Government raised and then withdrew a jurisdictional challenge under the Federal Acquisition Streamlining Act.  *See* ECF No. 50 at 29; ECF No. 52 at 7 n.1.  It also challenged CSI's standing

to protest the sole-source extension where it was not an Alliant Small Business GWAC contract holder, and thus not an actual or prospective offeror. *See* ECF No. 50 at 30. In its Reply, the Government indicated—for the first time—that, upon expiration of Octo Consulting's sole-source extension, the Agency issued a new sole-source bridge task order to IBM under its Alliant 2 contract for which CSI was also not eligible to bid. *See* ECF No. 52 at 7–10. The Government attached several exhibits to its Reply showing the bridge task order that GSA issued on January 31, 2025, to IBM for ELFF services.[2] *See* ECF No. 52-1 at 2–10.

To maintain a protest of a procurement action, a bid protester must be an "interested party" within the meaning of the Tucker Act. 28 U.S.C. § 1491(b)(1). To be an interested party, CSI must show that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest" in the contract at issue. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). Apart from establishing "interested party" standing, a plaintiff must also

---

[2] CSI moved to strike these exhibits and the corresponding arguments in the Government's Reply, arguing the Government's use of such exhibits is procedurally unfair, fails to comply with the requirement to include relevant bid-protest documents in the formal administrative record, and constitutes a waiver of the Government's standing argument. *See* ECF No. 53 at 2–4. Although the Court acknowledges the fairness concerns that result from introducing a new argument or evidence for the first time in a reply, the Government is correct in noting that the evidence it provided concerns this Court's jurisdiction to hear CSI's challenge. *See* ECF No. 56 at 1–2. Because the Court must assure itself that it retains jurisdiction over a plaintiff's claims, it is "not restricted" in its review of "evidence extrinsic to the pleadings" and should consider post-filing evidence. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *see Acetris Health, LLC v. United States*, 949 F.3d 719, 726 (Fed. Cir. 2020). And, because the parties sought and received an opportunity to address the Government's argument and evidence, *see* Oral Arg. Tr. at 4:14–17:14, ECF No. 58, CSI had the chance to respond to the Government's exhibits. *See Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 260 (2024). Accordingly, the Court will deny CSI's Motion to Strike. As noted below, CSI will be permitted to amend its Second Amended Complaint to address the new bridge task order.

demonstrate that its claim satisfies Article III's case-or-controversy requirement.[3]  U.S. CONST.

art. III, § 2.  "[I]t is axiomatic that a federal court may not address 'the merits of a legal question

not posed in an Article III case or controversy,'" and that a live dispute must exist at all stages

including through appellate review.  *eSimplicity, Inc. v. United States*, 122 F.4th 1373, 1376 (Fed.

Cir. 2024) (alteration in original) (internal quotations omitted) (quoting *Aqua Marine Supply v.*

*AIM Machining, Inc.*, 247 F.3d 1216, 1219 (Fed. Cir. 2001)); *Powell v. McCormack*, 395 U.S. 486,

496 (1969) (holding that a claim "is moot when the issues presented are no longer 'live' or the

parties lack a legally cognizable interest in the outcome").

"[W]hen the potential for injury has been mooted by events, the federal courts are deprived

of jurisdiction."  *Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764, 770 (Fed. Cir.

2019).  Generally, in bid protests, the expiration or cancellation of a solicitation or contract renders

the dispute between the parties moot.  *See, e.g.*, *eSimplicity*, 122 F.4th at 1376; *Mitchco Int'l, Inc.*

*v. United States*, 26 F.4th 1373, 1378 (Fed. Cir. 2022); *Bitscopic, Inc. v. United States*, 166 Fed.

Cl. 677, 697–98 (2023); *Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673, 680 (2009).

Because the sole-source extension that CSI challenged in its Second Amended Complaint

expired, the second claim in CSI's bid protest is moot and must be dismissed.  CSI challenged

GSA's legal authority to issue that extension, alleged factual errors in GSA's justification for the

extension that purportedly rendered it arbitrary and capricious, and contended that Octo Consulting

had no legal basis for its current performance given that the extension expired on its own terms.

*See* ECF No. 47 at 33–36.  But the expiration of the sole-source extension on January 31, 2025

---

[3] Although this Court operates under Article I of the Constitution, it nonetheless applies the same justiciability doctrines enforced by other federal courts.  *See Associated Energy Grp.,* *LLC v. United States*, 131 F.4th 1312, 1317 (Fed. Cir. 2025).

and GSA's decision to issue a new bridge task order to IBM on that date moot all of CSI's arguments.  *See eSimplicity*, 122 F.4th at 1376.

Moreover, the Second Amended Complaint does not challenge the new bridge task order, understandably, because CSI only learned of that contract upon the Government filing its Reply. However, it is axiomatic that a plaintiff cannot amend its pleading with new allegations or claims raised in dispositive briefing.  *See Winnemucca Indian Colony v. United States*, 167 Fed. Cl. 396, 419 (2023) (citing *Jarvis v. United States*, 154 Fed. Cl. 712, 718 (2021)).  Rather, to the extent CSI seeks to challenge the current bridge task order to IBM, it may amend the Second Amended Complaint.[4]  The Government is free to re-raise its standing argument in a renewed dispositive motion.  Accordingly, CSI's challenge to the sole-source extension of Octo Consulting's incumbent contract is dismissed without prejudice as moot.

### B. The Record Supports GSA's Rational Decision to Reevaluate Quotes, but It Does Not Provide an Adequate Explanation for Cancelling the Contract Award.

As to the primary basis of its protest, CSI challenges the Agency's initial corrective action following Octo Metric's protest, which notified the GAO that GSA would reevaluate quotes in accordance with the Solicitation's stated evaluation criteria.  *See* ECF No. 47 at 23–24.  CSI argues that GSA provided no reason for the Agency's announcement of corrective action beyond the notice stating that the Agency would take corrective action.  *See id.* at 24.  CSI further argues that the Agency's later decision to cancel CSI's award and re-solicit for the Air Force's ELFF requirement, as explained in the D&F Memo, lacks a rational basis and fails to provide any rationale supporting its determination that the Solicitation was outdated and ambiguous and that such concerns required cancellation and re-solicitation.  *See id.* at 24–32.

---

[4] At argument, CSI's counsel essentially requested as much, seeking an opportunity to submit supplemental briefing on the new contract vehicle.  *See* Oral Arg. Tr. at 8:19–10:2, ECF No. 58.

The Court finds that the record provides sufficient clarity to reasonably discern the decisional path supporting GSA's rational choice to reevaluate quotes under the Solicitation, given the alleged evaluation errors Octo Metric identified in its protest before the GAO.  That reasonably discernible decisional path, though, does not extend to the Agency's choice to cancel the award to CSI and to re-solicit.    The D&F Memo identified "outdated" requirements and certain "ambiguities" in the Solicitation, but it failed to explain how the requirements were outdated, or how exactly the Solicitation was ambiguous and what clarification might be needed.   These conclusory justifications are not illuminated by a bare review of the Solicitation, the evaluation documents, or Octo Metric's GAO protest, which never alleged any ambiguities and instead alleged that the Agency failed to evaluate its quote according to the terms of the Solicitation. Without a more sufficient description of the Agency's findings and a clearer explanation connecting those findings to the determination made, the Court cannot uphold the cancellation on the current record.

1. Legal Standard

Under the APA's "arbitrary and capricious" standard that applies to judicial review of agency actions, an agency must base its action on "relevant data," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42–43 (1983), and "articulate a satisfactory explanation" for its action that includes "a 'rational connection between the facts found and the choice made,'" *id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  This "rational basis" standard applies to corrective actions during procurements.  *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018).  An agency's decision satisfies the rational-basis requirement if the agency "provided a coherent and reasonable explanation of its exercise of discretion."  *Impresa*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).

That said, the APA does not obligate contracting officers to provide written explanations for their decisions. *Id.* at 1337. And any written explanation provided "need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Where the record does not provide "sufficient clarity" concerning the agency's explanation or decisional path to "permit 'effective judicial review'" the decision should be vacated. *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). The reviewing court has the discretion to then remand the matter to the agency for "further explanation . . . necessary to a proper assessment of the agency's decision." *Camp*, 411 U.S. at 143; *see Impresa*, 238 F.3d at 1338 (holding that "a reviewing court has power to require an explanation" if necessary "for meaningful judicial review").

### 2. Corrective Action: Reevaluation of Quotes Under the Solicitation

CSI first alleges that the Agency provided inadequate documentation of its decision to pause transition activities on CSI's contract award and to reevaluate quotes following Octo Metric's GAO protest, rendering that initial action arbitrary and capricious under the APA. *See* ECF No. 47 at 23–24. Specifically, CSI argues that GSA provided no reason for its announcement of corrective action and that no document in the record provides further clarity. *Id.* This argument fails.

All that the APA requires is that the decisional path for an agency's action be reasonably discernible from the administrative record. *See Bowman Transp.*, 419 U.S. at 286. Indeed, the Supreme Court and United States Court of Appeals for the Federal Circuit have explained that, so long as the decisional path for an action is reasonably clear to a court, the APA "does not itself

24

require an agency to explain the basis for its decision." *Impresa*, 238 F.3d at 1337.  GSA clears the reasonable-basis bar here.

Far from providing absolutely no explanation for its decision to reevaluate quotes, GSA's notice to the GAO explained that "after reviewing" Octo Metric's challenges, GSA decided to "re-evaluate proposals reasonably and in accordance with the stated evaluation criteria and issue a new award decision that is reasonable and consistent with the terms of the" RFQ.  AR 765.  Indeed, this type of corrective action is typically undertaken in such a post-protest context "to correct a perceived prior error in the procurement process, or, in the absence of error, to act to improve the competitive process."  *Dell Fed. Sys.*, 906 F.3d at 986 n.1 (internal quotation marks omitted) (quoting *Dellew Corp. v. United States*, 855 F.3d 1375, 1378 n.2 (Fed. Cir. 2017)).  CSI faults the Agency for not conceding error in its corrective action notice filed in the GAO protest, but no such admission is required for an agency to voluntarily reconsider a procurement evaluation and award. *See ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 72 n.24 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002); *cf. SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001).

A review of the GAO protest materials supports GSA's rational exercise of its discretion to take corrective action.  *See Bowman Transp.*, 419 U.S. at 286; *Dell Fed. Sys.*, 906 F.3d at 992. Whether or not akin to a "kitchen sink" protest, as CSI argues, *see* Oral Arg. Tr. at 19:16–21, ECF No. 58, Octo Metric's GAO protest identified a number of alleged evaluation errors that, from the Court's review and as identified in the CO's later D&F Memo, provide a reasonable basis for the Agency to decide to conduct a reevaluation of quotes.  For instance, Octo Metric alleged that GSA failed to evaluate "each project submitted" by Octo Metric for its past-performance rating, *see* AR 600–02, when the Solicitation indicated that offerors should submit all experience within the prior

three years and stated that GSA "may consider any other information it receives for validation" of the offeror's experience, AR 75–76.  Octo Metric further alleged the Agency failed to evaluate Octo Metric "more favorably," AR 603; *accord* AR 79 (same language in provisions from the Solicitation), for submitting more than three similar past contracts and for submitting contracts with more than three similar characteristics, *see* AR 603.

The record indicates that GSA did, in fact, decline to give Octo Metric ratings on all five of its submitted past performance references.  *See* AR 562.  GSA indicated that it declined to make those assessments because the three submissions of Octo Metric that GSA rated justified the highest adjectival rating, meaning the Agency felt it did not need to validate Octo Metric's experience any further.  *See id.*  But Octo Metric raised a facially plausible argument that the failure to consider the remaining two submissions could have resulted in qualitative differences between its quote and CSI's.  *See* AR 606–07.

Other examples are apparent, but for purposes of the Court's review it is sufficient that Octo Metric's protest raised several allegations of evaluative errors from which GSA could reasonably conclude that reevaluation was in the best interest of the procurement.  *See DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999) (holding that procuring agency has "broad discretion to take corrective action where [it] determines that such action is necessary to ensure fair and impartial competition").  CSI therefore fails to demonstrate that GSA's initial corrective action was arbitrary and capricious.

3.  <u>Corrective Action: Cancellation of CSI's Award Under the Solicitation</u>

The Agency's later decision, however, to cancel CSI's award and to re-solicit the Air Force's ELFF requirement cannot be sustained on the Administrative Record before the Court.  The D&F Memo failed to articulate a coherent explanation for the Agency's decision, and the

Court cannot clearly discern GSA's decisional path in the current record.  A remand for further explanation is necessary to permit meaningful judicial review.

The D&F Memo documented the CO's justifications for cancelling CSI's award and re-soliciting the requirement under a revised solicitation.  *See* AR 771–75.  Those justifications included: (1) "Outdated PWS and Certification Requirement Ambiguities"; and (2) "Ambiguities found within the Request for Quote."  AR 773.  Each justification included a short explanation, and in the case of the second justification provided bullet points organizing the explanation of ambiguities by RFQ section.  CSI challenges each ground for GSA's decision, arguing that the explanations do not describe how the Solicitation's provisions were "outdated" or sufficiently ambiguous so as to justify cancellation and re-solicitation.  *See* ECF No. 47 at 24–32.  The Government, for its part, declines to substantively defend every aspect of the justifications, focusing instead on several purportedly outdated PWS provisions (identified only in the Government's brief, not in the D&F Memo) and three of the CO's examples of RFQ ambiguities to argue that the record, as a whole, provides adequate support for the Agency's decision.  *See* ECF No. 50 at 20–26.

The D&F Memo does not provide the Court sufficient explanation to understand what in the Solicitation was outdated, how certain provisions were ambiguous, and why those ambiguities justified cancelling CSI's award and re-soliciting the requirement with a revised solicitation.  The Court takes the Government's offered justifications in turn.

*Outdated provisions and certification ambiguities.*  First, the Government relies on the CO's determination that the PWS "is outdated and revisions to the [Requirement Lists]/Deliverables need to be made" and that the "certifications requirements were not clearly identified and carried over to the" Solicitation.  AR 773; *see* ECF No. 50 at 22–23.  Generally, this

Court defers to an agency's decision to cancel a solicitation and to issue a new one that aligns more closely with the agency's requirements. *See Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 452–53 (2021). If the PWS was outdated or incorrect, this justification certainly *could* supply a rational basis for GSA's decision. The problem for the Government here is that the D&F Memo did not identify which portions of the PWS were outdated and which deliverables or requirements needed to be revised. *See* AR 773. Thus, the record does not provide an indication—even if only a minimal one—of how exactly cancellation and re-solicitation will align more closely with the Agency's requirements. Where the record lacks any coherent and reasonable justification for a decision, that decision does not satisfy the APA's rational-basis standard. *See Impresa*, 238 F.3d at 1333; *see also Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 206–07 (2016) (noting the Supreme Court's caution that reviewing courts should not simply rubber-stamp unexplained agency decisions).

The only (post-hoc) explanation the Government attempts to provide to support this finding is that "an overall review of the deliverables/CDRLs required under" the PWS "generally cover[s] requirements such as Training Plan-CDRL A014, Information Support Plan CDRL A009, and Program Performance Metrics-A004 that if removed, would not correctly reflect the Government's requirements and conversely an offerors' understanding of it." ECF No. 50 at 23; *see* AR 91–94. Setting aside the fact that these references appear nowhere in the D&F Memo, *see* AR 773, the Court finds no basis—and the Government provides no basis—in the record to review the assertion that these requirements no longer reflect the Agency's requirements. Such an assertion is certainly not self-evident from the PWS, which, to the Court's eyes, simply laid out a series of requirements with no further explanation or indication of why those requirements might be outdated. *See* AR 91–94; *see also, e.g.*, AR 108 (noting "Training Plan–CDRL A014," which required the contractor

to "review, update, implement, and maintain the existing ELFF Training Plan"). It very well may be true that these requirements no longer reflect the Agency's current technical and service requirements, but the Agency must provide a clearer explanation (indeed, *any* explanation) of that fact to satisfy APA arbitrary-and-capricious review. *See Impresa*, 238 F.3d at 1333; *Yang Enters.*, 156 Fed. Cl. at 452–53 (deferring to an agency's decision to cancel and re-solicit where the record provided evidence for how the agency's needs had changed).

The Government next turns its attention to the CO's determination that "certifications requirements were not clearly identified and carried over to the" Solicitation. AR 773; *see* ECF No. 50 at 22–23. The Government asserts that the PWS and the Solicitation "clearly conflict," ECF No. 50 at 22, because the PWS indicated that all information-technology personnel must meet certification requirements outlined elsewhere in the PWS, *see* AR 122, while the Solicitation itself indicated that "key personnel" should possess "required certifications" in compliance with paragraph 7.5 of the PWS, AR 71. Again, setting aside the fact that the D&F Memo does not specify which "certifications requirement" was not clearly identified and carried over into the Solicitation, AR 773, the Government's explanation of the record fails to provide the Court a reasonably discernible path to assess the Agency's justification. The key-personnel certifications requirement in the Solicitation referenced paragraph 7.5 of the PWS, thereby providing offerors a clear reference to ensure that, at a minimum, their key personnel's certifications were satisfactory. *See* AR 71, 123. One page earlier in the PWS, GSA laid out the information technology certification requirement, which established that all personnel in such positions must meet certification requirements identified later in the PWS. *See* AR 122. These provisions do not clearly conflict. Nowhere did the Solicitation indicate that key-personnel certifications were the *only* certifications offerors had to provide. *See* AR 70–72. Indeed, the PWS—which the

Solicitation expressly incorporated by reference, *see* AR 66—stated that additional information-technology certifications *were* required, *see* AR 122.  As above, this conclusory statement in the D&F Memo fails to provide the Court a basis to clearly assess what exactly was wrong with the Solicitation, how the Agency's needs necessitated revision, and how the proposed revisions would address its concerns.  *See Impresa*, 238 F.3d at 1333.

*Solicitation ambiguities.*  The Government's second justification relates to the ambiguities the CO identified in the Solicitation.  Although it reserves its argument that any—or all—of the ambiguities justify the cancellation, the Government here explicitly invokes three of the purported ambiguities listed in the D&F Memo: the need to clarify (1) whether the Agency would evaluate each project submitted that was sufficiently similar to the Solicitation, even if an offeror submitted more than three projects, *see* AR 774 ("RFQ 3.4.8"); ECF No. 50 at 25; (2) how the Government would evaluate offerors' past-performance submissions "vis-a-vis their Relevancy, Recency, and Confidence," AR 774 ("RFQ 3.4.6"); *see* ECF No. 50 at 25; and (3) the establishment of certification requirements, specifically with respect to personnel positions, *see* AR 774 ("RFQ 3.3 Evaluation Factor 2"); ECF No. 50 at 26.

For RFQ 3.4.8, the D&F Memo recommended expanding on how "more favorability ratings" will be conducted, noting that "[t]he Government did not apply this factor during technical evaluation."  AR 774.  According to the Government, that the Agency declined to consider past-performance submissions beyond the three sufficient to support the highest confidence rating for Octo Metric's proposal itself serves as evidence that the Solicitation was ambiguous.  *See* ECF No. 50 at 25.  The Government concedes that the Solicitation "indicates GSA *will* evaluate each of the projects submitted that meets the definition of 'Similar Contract/Task Order.'"  *Id.* (quoting AR 79).  "Yet, the record indicates it did not."  *Id.*  As CSI convincingly argues, the conclusion

that the Solicitation was ambiguous does not necessarily follow from the Agency's failure to apply what seem to be, at least in the Government's own characterization, fairly clear Solicitation and PWS provisions. *See* ECF No. 51 at 18. Such a failure seems instead like an "evaluation error, not proof of an ambiguity." *Id.* Without any explanation from the CO of *why* the provisions were ambiguous, the Court is left to guess as to the basis for that conclusion.

The Government next points to the CO's determination that RFQ 3.4.6 needs to "[c]learly outline how the Government is going to evaluate the performance of the offeror's proposal vis-a-vis their Relevancy, Recency, and Confidence." AR 774; *see* ECF No. 50 at 25. Setting aside that the CO did not explain what about the past-performance relevancy, recency, and confidence provisions was ambiguous and how revision of the Solicitation would address that problem, *see* AR 774, the Government argues that the proposed change was intended to clarify how the TEB would consider "the adjectival ratings" from the past-performance questionnaires "as it pertains to an offeror[']s Factor 3 overall rating," ECF No. 50 at 25. Even if that rationale were self-evident from the record, the Court is still left to guess at the Agency's rationale for its conclusion that the Solicitation as it stood was ambiguous. The Solicitation required offerors to submit the past-performance questionnaires, each of which included a scale ranking from (at a high level) "excellent"—*i.e.*, a strongly positive rating—to "unsatisfactory"—*i.e.*, a strongly negative rating. AR 136; *see also* AR 77 (requiring submission of questionnaires). The Solicitation then indicated the Agency would assess the quality of performance for offerors' submissions, ranging from "Substantial Confidence"—*i.e.*, a strongly positive rating—to "No Confidence"—*i.e.*, a strongly negative rating. AR 78. Neither the D&F Memo nor the Government's post-hoc explanation provides a coherent rationale for the assertion that such provisions were ambiguous, especially when the Solicitation seemed to provide guidance for offerors and the TEB to apply past-

31

performance questionnaire responses (on a scale from positive to negative) to a past-performance confidence rating (also on a positive-to-negative scale).  Without a coherent explanation of the ambiguity, the Court cannot assess the CO's basis for deciding to revise the Solicitation on this ground.  *See Impresa*, 238 F.3d at 1332–33.

Finally, the Government points to the CO's conclusion that certification requirements under RFQ 3.3 for the Factor 2: Staffing Approach need to be "[c]learly establish[ed]" by "incorporating verbiage to demonstrate the immediate removal of an offeror's proposal if any of the items therein are missing."  AR 774; *see* ECF No. 50 at 26.  The CO also noted that clarification was necessary to identify "requirements relating to the expansion of personnel positions."  AR 774.  Much as for the above rationale, this justification appears to the Court to repurpose potential evaluation errors as evidence to argue that the Solicitation contained ambiguities.  For example, the apparent need to make staffing certification a required element of a quote does not suggest that the provision itself was ambiguous, especially where the Solicitation already indicated that a failure to provide information about key personnel would result in immediate disqualification.  *See* AR 70–71 (Pass/Fail "Requirement 3 – Required Certifications").  It could suggest that the Solicitation did not accurately reflect the Agency's needs, but that is not clear from the justification that the CO provided for revision.  *See* AR 774.  The same logic applies to requirements for "expansion of personnel positions," *id.*, which the Solicitation did not address.  That very well might reflect an Air Force need, but it is unclear how the Solicitation's failure to account for that need resulted in an *ambiguity*.  In short, the CO's rationale is not adequately explained, and the Government's attempt to fill the gaps does not coherently relate the CO's findings to the CO's conclusion that the Solicitation needed revision.

The Government declines to defend in substance the rest of the ambiguities the CO identified in the D&F Memo.  *See* ECF No. 50 at 24–25.  The Court's review of those rationales does not, without more, uncover an adequate explanation or a reasonably discernible decisional path rationally linking ambiguities to the CO's choice to cancel CSI's award and re-solicit.  *See State Farm Mut. Auto. Ins.*, 463 U.S. at 42–43.  For instance, prior to quotes being submitted, GSA addressed offerors' evident confusion over the number of full-time positions estimated under the contract and confirmed that the Solicitation contemplated 24—not 12—positions.  *See* AR 228.  As a result, it is not clear why revision of this provision is necessary or would support cancellation, as the D&F Memo indicated.  *See* AR 773 ("RFQ 1.9, Estimated Staffing Requirements").  Further, the CO's finding that Cyber Supply Chain Risk Management Compliance "should not be a mandatory requirement" does not on its face qualify as an ambiguity.  *Id.* (RFQ 3.1.6).  Additionally, several bullet points of the rationale identify vagueness within certain Solicitation provisions without indicating what was vague about the language and how revision would lead to more clarity.  *See* AR 773–74 (including "RFQ 3.2[,] Evaluation Factor 1 – Technical Approach," "RFQ 3.4, Evaluation Factor 3 Past Performance & Experience," "RFQ 3.4.1, Past Performance Relevancy," and "RFQ 3.4.2, Past Performance Recency").

\*      \*      \*

In sum, the D&F Memo, as it stands, does not provide an adequate explanation of or lay out the decisional path the Agency followed to make its determination that the Solicitation was outdated, contained ambiguities, and required revision and re-solicitation.  In most instances, the explanation is so conclusory that it does not facilitate effective judicial review.  Thus, the existing record does not provide a rational basis for the Agency's decision.  *See Impresa*, 238 F.3d at 1332.

**C.    Remand Without Vacatur, Rather than Injunctive Relief, Is Warranted.**

Because the Court has determined that the existing record does not provide an adequate basis to uphold GSA's decision to terminate the contract award to CSI, it must address the appropriate relief to be afforded.  CSI requests that the Court enjoin GSA's termination of the contract award to CSI because GSA's decision to cancel and re-solicit lacks a rational basis and is arbitrary and capricious.  But the failure here is not necessarily based on the substance of GSA's justifications, but rather the inadequacy of its explanation.  Even CSI concedes that outdated requirements and certain solicitation ambiguities, if adequately explained, could state a rational basis for an agency's decision to cancel and re-solicit.  *See* ECF No. 58 at 27:6–24.

The lack of adequate documentation or detailed explanation of an agency's decision, however, does not itself render an action arbitrary and capricious per se.  Where an agency's failure to adequately explain a final decision hinders effective judicial review, courts typically order the decisionmaker to provide "such additional explanations of the reasons for the agency decision as may prove necessary."  *Camp*, 411 U.S. at 143; *see also Impresa*, 238 F.3d at 1338.  In that scenario, courts may order a remand without vacatur to allow the agency to provide further explanation.  *See, e.g.*, *RTD Middleburg Heights, LLC v. United States*, 172 Fed. Cl. 656, 670 (2024); *Point Blank Enters., Inc. v. United States*, 168 Fed. Cl. 676, 689 (2023); *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 85–86 (2022); *Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 311 (2021).

On this record, the Court concludes it may be possible for GSA to articulate a reasonable explanation that rationally connects its findings related to outdated and ambiguous solicitation provisions to its cancellation decision, so remand is appropriate.  *Point Blank*, 168 Fed. Cl. at 689; *see also Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed.

Cir. 2001).  Further, remand can be completed expeditiously, and the balance of equities favors a limited remand over the issuance of a permanent injunction.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** CSI's Motion for Judgment on the Administrative Record (ECF No. 47) and **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF No. 50).  The Court **DENIES** CSI's Motion to Strike (ECF No. 53).

Pursuant to 28 U.S.C. § 1491(b)(2) and RCFC 52.2(a), this matter is **REMANDED** to GSA to further explain its decision to terminate the award of contract number 47QFLA24F0019 to CSI and to re-solicit the Air Force's ELFF requirement under a revised solicitation.  The Court provides the following directions to the parties on remand:

1)   The duration of the remand is **21 days** from the date of this Opinion and Order, or until **August 7, 2025**.

2)   The administrative record on remand shall include a supplemental decisional document further describing the CO's basis for terminating the contract award to CSI and re-soliciting under a revised solicitation.

3)   The case will be stayed during the remand.

4)   Pursuant to RCFC 52.2(e), the parties shall file a Joint Status Report within **7 days** after the conclusion of remand proceedings, or by **August 14, 2025**, that sets forth the parties' positions regarding whether further litigation in this matter is necessary. If further proceedings are appropriate, the Court intends to order the following schedule for simultaneous dispositive briefing:

- Amended Administrative Record **August 21, 2025**

- Plaintiff's Third Amended Complaint **September 4, 2025**

- Renewed dispositive motions **October 2, 2025**

- Responses to renewed motions **October 23, 2025**

The Clerk is directed to serve a certified copy of this sealed Opinion and Order on the GSA

at:

Carman J. Arroyo
Senior Contracting Officer
Federal Acquisition Services
General Services Administration
2 S. Main St.
Akron, OH 44308

**SO ORDERED**.

Dated: July 17, 2025

*/s/ Kathryn C. Davis*
KATHRYN C. DAVIS
Judge