**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAN SOFTTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 24-1009 |
| | ) | |
| v. | ) | Filed: April 27, 2026 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: May 8, 2026* |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

This matter is before the Court following a remand to the General Services Administration ("GSA" or "the Agency") to provide further explanation of its June 25, 2024 decision to terminate and re-solicit the task order it initially awarded to Plaintiff CAN Softtech, Inc. ("CSI") to provide information technology ("IT") support services to the Department of the Air Force ("Air Force"). The Agency's termination and re-solicitation decision was based on its findings that the performance work statement ("PWS") was outdated and that the request for quote ("RFQ") contained ambiguities. In the Court's previous decision, it held that GSA failed to adequately explain its decision because the Agency's Determination & Findings Memorandum ("D&F Memo") did not identify which portions of the performance work statement ("PWS") were outdated, which deliverables or requirements needed to be revised, and which certification requirement was not clearly identified and carried over to the solicitation, nor did it coherently explain the solicitation ambiguities.

---

\* The Court issued this opinion under seal on April 27, 2026, and directed the parties to file any proposed redactions by May 4, 2026. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

On remand, GSA submitted a Supplemental Decision Document ("SDD") further explaining its determination that termination and re-solicitation were necessary. In the SDD, the Agency clarified how the PWS was outdated and did not reflect the Air Force's actual needs, and how the RFQ contained several ambiguities that prevented fair and equal competition. Continuing its objection to the Agency's termination and re-solicitation decision as arbitrary and capricious, CSI now challenges the further explanation in the SDD.

Two issues are before the Court: CSI's Motion to Supplement and/or Complete the Administrative Record and the parties' Renewed Cross-Motions for Judgment on the Administrative Record. For the reasons explained below, the Court **GRANTS** CSI's Motion to Supplement and/or Complete the Administrative Record, **DENIES** CSI's Motion for Judgment on the Administrative Record, and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record.

## I.    BACKGROUND

### A.    Factual and Procedural Background

On January 2, 2024, GSA awarded Task Order No. 47QFLA24F0019 (the "Task Order") to CSI under RFQ No. 47QFLA23Q0116 (the "Solicitation" or "RFQ") to fulfill the Air Force's eFINANCE, LeaveWeb, FMSuite, and FMDQS (collectively, "ELFF") requirement for IT support services. Admin. R. ("AR") 544, 551, ECF Nos. 19-1, 27-1, 42-2, 46-2, 64-2.[1] The Task Order

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers. The original Administrative Record includes pages 1–781 (ECF No. 19-1); an amendment with additional documents not provided in the original record includes pages 782–948 (ECF Nos. 27-1, 46-2); and an amendment with redacted copies of documents reviewed in camera includes CSI-IC 1–87 (ECF No. 42-2). The supplement to the record created on remand includes pages 949–956 (ECF No. 64-2). The Court will collectively refer to all parts as the Administrative Record or "AR." Citations to the documents provided in camera use the separately paginated bates-labeled page numbers, *i.e.*, the page numbers following "CSI-IC."

was an assisted acquisition whereby GSA facilitated the procurement to meet the Air Force's needs. AR 66, 155. Thus, the Air Force was primarily responsible for developing the PWS, which "establishes what contractors must deliver." AR 952; *see also* AR 949 (indicating GSA "relied on the Air Force to provide the most current PWS reflecting their operational needs"). GSA, on the other hand, was primarily responsible for developing the RFQ, which provides "evaluation factors [that] govern how proposals are scored." AR 952; *see also* AR 771–72 (indicating GSA developed the RFQ based on the Air Force's requirements).

On January 12, 2024, Octo Metric LLC ("Octo Metric") filed a bid protest at the Government Accountability Office ("GAO") challenging the Task Order award to CSI. AR 576–624. Octo Metric is a small-business joint venture between Malik Consulting, Inc. and the incumbent contractor, Octo Consulting Group LLC ("Octo Consulting"). *See* AR 336. Octo Consulting was acquired by International Business Machines Corporation ("IBM") in December 2022, and Octo Consulting's contracts with the Government were novated to IBM between August 2024 and January 2025. *Id.*; Decl. of Jason R. Miller ¶ 6, ECF No. 76-1. Octo Metric's GAO protest generally alleged that GSA unreasonably evaluated the offerors' proposals in a manner inconsistent with the Solicitation's stated evaluation criteria. AR 577–79; *see also* AR 622. On January 27, 2024, the Agency indicated it would take corrective action, including re-evaluation of proposals and issuance of a new award decision. AR 765. CSI subsequently challenged that decision in this Court. *See* Pl.'s Compl. ¶¶ 1–8, ECF No. 1. In light of GSA's decision to take corrective action, GAO dismissed Octo Metric's protest as moot on January 31, 2024. AR 766.

This opinion assumes the reader's familiarity with the Court's prior decision in this case, which provided a fulsome factual background of the procurement, as well as a summary of the procedural history up to July 17, 2025, the date of that opinion. *See CAN Softtech, Inc. v. United*

*States* ("*CSI I*"), 177 Fed. Cl. 379, 384–92 (2025). In that decision, the Court ruled on CSI's challenges to the Agency's sole-source extension of Octo Metric's contract, initial decision to take corrective action to re-evaluate proposals, and later decision to terminate CSI's award and re-solicit the requirement. *Id.* at 384. The Court dismissed CSI's challenge to the contract extension as moot because the extension, which sought to ensure continuity of services during the pendency of Octo Metric's GAO protest, had already expired. *Id.* at 393–95. The Court also held that GSA's decision to take corrective action in the form of re-evaluating proposals was adequately supported by the record. *Id.* at 396–97. As for the Agency's decision to terminate the award to CSI and re-solicit the requirement, however, the Court found that the action was not adequately supported by the record. *Id.* at 397–400. Specifically, the D&F Memo, which generally cited outdated PWS requirements and ambiguous Solicitation provisions as the reasons for cancelling the award, did not provide sufficient explanation of "what in the Solicitation was outdated, how certain provisions were ambiguous, and why those ambiguities justified cancelling CSI's award and re-soliciting the requirement with a revised solicitation." *Id.* at 397.

First, regarding the outdated provisions and certification ambiguities, the Court noted that the D&F Memo "did not identify which portions of the PWS were outdated and which deliverables or requirements needed to be revised." *Id.* at 398 (citing AR 773). Similarly, the D&F Memo did "not specify which 'certifications requirement' was not clearly identified and carried over into the Solicitation." *Id.* (quoting AR 773). The Government asserted in its briefing that the PWS and the Solicitation conflicted because the PWS indicated that all IT personnel must meet certain certification requirements outlined in the PWS whereas the Solicitation indicated that key personnel should possess certain required certifications under PWS section 7.5. *Id.* (citing AR 71, 122–23). The Court found that these two provisions "do not clearly conflict" because the

Solicitation did not indicate that the key-personnel certifications were the only certifications required. *Id.*  In fact, the PWS built on the Solicitation by stating that IT certifications were also required. *Id.* (citing AR 122).  The Court therefore found that the D&F Memo failed to provide a sufficient explanation of why the outdated provisions and certification ambiguities (whatever they may be) served as a basis for the termination decision.  *Id.* at 398–99.

Second, as to the Solicitation ambiguities, the Government defended the Agency's termination decision based on three purported ambiguities listed in the D&F Memo.  The Court noted that the first issue of whether the Agency would evaluate each sufficiently similar past performance project submitted, even if an offeror submitted more than three projects, was more likely an evaluation error rather than proof of an ambiguity.  *Id.* at 399 (citing AR 774).  The D&F Memo offered no explanation of why the provision was ambiguous.  *Id.*  Similarly, the D&F Memo inadequately explained the second alleged ambiguity in how the Government would evaluate the offerors' past performance submissions.  *Id.* (citing AR 774).  Contrary to the Government's contentions, the Court found that the Solicitation provided guidance for the offerors and the evaluation team to apply past performance questionnaire responses to past performance confidence ratings, both of which were described along a positive-to-negative scale.  *Id.* (citing AR 77–78, 136).  Lastly, the alleged ambiguity regarding whether staffing certifications were a required element of the offerors' proposals was again more likely a potential evaluation error rather than evidence of ambiguity.  *Id.* at 399–400 (citing AR 774).  The Court found that the Agency's apparent need to make staffing certifications a required element of the offerors' proposals did not necessarily mean that the Solicitation was ambiguous because the Solicitation already indicated that a failure to provide information about key personnel would result in immediate disqualification.  *Id.* at 400 (citing AR 70–71).  Thus, the Court held that the Solicitation's

ambiguities, as described, similarly failed to provide an adequate explanation for GSA's termination decision. *Id.*

However, because the Agency's stated rationale (*i.e.*, outdated PWS and ambiguous solicitation provisions) could support GSA's decision if adequately explained, the Court remanded to the Agency for further explanation. *Id.* at 400–01. The Court instructed GSA to include in the Administrative Record on remand, "a supplemental decisional document further describing the [Contracting Officer ("CO")]'s basis for terminating the contract award to CSI and re-soliciting under a revised solicitation." *Id.* at 401.

**B.    GSA's Remand Decision**

On August 21, 2025, the Government filed the Agency's SDD with the Court. Def.'s Notice of Filing Am. Admin. R. on Remand, ECF No. 64. Consistent with the Court's remand order, the SDD further describes the CO's decision to terminate CSI's Task Order and re-solicit the Air Force's ELFF requirement. *See* AR 949–56. In sum, the CO explains that the decision was based on his determination that the existing solicitation does not accurately reflect the Air Force's actual needs and that concerns regarding fair competition cannot be resolved through re-evaluation of the existing proposals. AR 949.

1.    PWS Changes

First, the CO explains that the outdated PWS does not align with the Air Force's current needs because "the Air Force-provided PWS was already outdated when incorporated into the Solicitation." *Id.* The CO then "discovered further revisions were necessary during the second re-evaluation."[2] AR 949–50. In all, the CO identifies 36 PWS modifications that he believes will

---

[2] The record reflects two evaluation periods: (1) the initial pre-award evaluation conducted from September–December 2023; and (2) the post-award re-evaluation conducted from February–April 2024 during the corrective action taken in response to Octo Metric's GAO protest. *See* AR

"fundamentally transform the procurement." AR 950. For example, the revised Contract Data Requirements List ("CDRL") will eliminate three "important" deliverables and modify seven other deliverables.[3] *Id.* The three eliminated deliverables are the: (1) "Program Performance Metrics," (2) "Information Support Plan," and (3) "Training Plan" deliverables (collectively, the "Three Core Deliverables"). *Id.*

The CO explains that the Program Performance Metrics deliverable in the outdated PWS "required contractors to establish, maintain, and routinely report product-oriented metrics to the Program Management Office (PMO), necessitating dedicated analytics personnel and reporting infrastructure that contractors factored into their pricing." *Id.* The Information Support Plan deliverable required contractors to "review[], update[e], and maintain[] documentation aligned with Global Information Grid Technical Guidance Federation (GTG-F) standards, requiring specialized expertise in information exchange protocols and continuous PMO coordination." *Id.* And the Training Plan deliverable "required contractors to review, update, implement, and maintain the ELFF Training Plan in conjunction with other contract and government employees, including the development of training activities and collateral support materials to instruct users on system functionality." *Id.*

The SDD observes that, although the Air Force no longer requires these deliverables, the offerors included them in their proposals. *Id.* For example, Octo Metric's proposal "discusse[d] dedicating Information System Security Officers (ISSOs) to ELFF applications." *Id.* (citing AR 349). Further, CSI proposed utilizing "personnel to '. . . implement various metrics such as user

---

772–73. References to the "second re-evaluation" in the SDD appear to refer to this February– April 2024 re-evaluation period.

[3] While the SDD initially refers to six modified deliverables, AR 950, the SDD later includes a list of seven, AR 951.

satisfaction, error rates, request rate, average response time, and more.'" *Id.* (italicization omitted) (quoting AR 246–47). CSI's team also planned to "review[] and maintain[] the Information Support Plan (ISP)," and "enhance the ELFF Training Plan," including by updating it based on feedback from stakeholders. *Id.* (italicization omitted) (quoting AR 246–47). As the CO concludes, "these three CDRLs represented recurring deliverables requiring specialized staff and labor hours . . . that contractors included in their proposals but would never actually need." AR 951. The SDD also lists seven CDRLs that will be modified to accept "equivalent electronic form(s)" instead of "formal documentation." *Id.* The CO explains that this, too, will "substantially reduc[e] the originally priced administrative effort." *Id.*

Second, the CO observes that eliminating required compliance with the Business Enterprise Architecture ("BEA") and Standard Financial Information Structure ("SFIS") obligations in the outdated PWS will "remove[] the requirement for transactions to align with the United States Standard General Ledger," thereby "eliminat[ing] an entire compliance framework contractors built into their technical approaches and pricing." *Id.* For example, CSI proposed "initiat[ing] a thorough gap analysis of [its] existing system to pinpoint non-compliances and potential areas of improvement, ensuring that all transactions align perfectly with the United States Standard General Ledger." *Id.* (italicization omitted) (quoting AR 249). Conversely, the CO notes that Octo Metric's proposal did not address this requirement and therefore "gained additional space to elaborate on other technical aspects, creating an uneven competitive advantage over CSI and other contractors who properly allocated proposal resources to this requirement." *Id.* As the CO explains, this "inequity" was compounded because "the evaluation team did not assess proposals against this PWS requirement as specified, allowing non-compliant proposals to avoid penalty while compliant offerors received no credit for their adherence to the stated requirements." *Id.*

Third, the SDD describes "significant new requirements" that will be introduced in the revised PWS. *Id.* The CO explains that these new requirements are prompted by a "shift from enterprise-focused ServiceNow to the more accessible Jira platform," which "lowers barriers for smaller contractors while expanding required platform expertise." *Id.* This shift will result in "major changes," as the revised PWS will include new systems and IT infrastructure requirements. *Id.*

In addition to these "major changes," the SDD notes that "numerous PWS modifications [] collectively transformed the requirements landscape." *Id.* "Most notably," the CO observes, PWS section 2.4.1.19 (Information System Security Plan), will "eliminate[] manual security documentation, requiring contractors to use [the Enterprise Mission Assurance Support Services ("eMASS") system] instead." *Id.* The SDD explains that the eMASS system will handle the full cybersecurity risk management process under the revised PWS and "demands specialized training to navigate its security authorization tools, controls scorecard measurement, and dashboard reporting." *Id.*

The SDD goes on to discuss that "[t]he regulatory framework has similarly evolved," as the Air Force transitioned from the Air Force Manual ("AFMAN") 17-1303 to the Department of the Air Force Manual ("DAFMAN") 17-1305. AR 952. The CO explains that the DAFMAN 17-1305 imposes "stricter requirements," including "mandat[ing] alignment with the DoD Cyber Workforce Framework (DCWF)" and "standardizing cyber roles, training, and certifications across the Department of Defense." *Id.* Further, DCWF personnel must be certified before starting contract work, creating additional training and certification costs for contractors. *Id.*

Finally, the SDD describes how "[a]dditional modifications compound these changes." *Id.* The CO notes that the revised PWS will: (1) replace "Qualification Acceptance" with "Integration

9

Testing"; (2) introduce an "Authorization to Operate" requirement under the "Information Assurance certifications"; (3) remove "the legacy migration requirement"; and (4) replace "ServiceNow" with "Jira for Software Problem Reports." *Id.*

The SDD concludes the discussion of the necessary PWS changes by noting that "[t]hese changes directly impact Full-Time Equivalent (FTE) allocations, labor estimates, and cost proposals." *Id.* Referencing both CSI's and Octo Metric's proposals, the CO observes that the offerors "structured teams and pricing for requirements that no longer exist while lacking resources for new requirements they had no opportunity to propose." *Id.* Thus, the CO concludes, "these revisions create a fundamentally different solicitation from what contractors originally bid on[,]" and "[t]he gap between what was originally required and what is actually needed prevents any fair evaluation of current proposals." *Id.*

2.      RFQ Ambiguities

Next, the SDD addresses the RFQ ambiguities enumerated in the D&F Memo. Of the 12 ambiguities originally listed, the SDD identifies three categories that "proved most critical to the termination decision": (1) contradictory past performance submission requirements and evaluation criteria; (2) undefined personnel certification requirements exacerbated by underlying regulatory changes; and (3) vague evaluation criteria throughout the Solicitation.[4] AR 952.

First, the SDD explains that "[t]he primary conflicting requirement exists within **Ambiguity #7** (RFQ [section] 3.4, Evaluation Factor 3 – Relevant Experience & Past Performance) (AR 75), specifically between sub-sections 3.4.1 (AR 75) and 3.4.4 (AR 76), which

---

[4] The SDD notes that "the remaining ambiguities from the original D&F Memo . . . had minimal impact on the termination/re-solicitation decisions" and "were included [in the D&F Memo] primarily to provide a comprehensive overview of all RFQ issues rather than as substantive grounds for cancellation." AR 954.

contain direct contradictory past performance submission requirements."[5]  AR 953.  The CO

explains the conflict as follows: "RFQ [section] 3.4.1 allows past performance experience from

either prime contractor or subcontractor roles, while RFQ [section] 3.4.4 (**Ambiguity #8**)

mandates submission of three contracts with at least two as the prime contractor." *Id.* (citing AR

75–76).  The SDD goes on to describe how "[t]his causes confusion as to whether a subcontractor's

performance as a prime contractor on a similar contract/task order satisfied RFQ [section] 3.4.4['s]

minimum requirement." *Id.*

The CO explains that "[a]lthough the Government attempted to provide clarification

through a Questions and Answers (Q&A) document (AR 230), the conflicting requirements

persisted, leading contractors to submit proposals based on varying interpretations." *Id.*  As a

result, "some proposals were non-compliant, and evaluations became inconsistent regarding

relevancy (**Ambiguity #8**), recency (**Ambiguity #9**), and confidence (**Ambiguity #10**)." *Id.*  This

effectively led to a situation where "[c]ontractors with equivalent qualifications were assessed

using different standards based on how they interpreted the contradictory language." *Id.*  For

example, the SDD notes that "the Government rated a contractor (CSI) as having the highest

relevant experience and past performance despite that contractor's failure to submit past

performance records as required by RFQ section 3.4.4 (**Ambiguity #8**)."  AR 953–54.

---

[5] In the D&F Memo, the ambiguities are contained in a bulleted list. *See* AR 773–74.  The SDD, however, refers to the ambiguities numerically in the order they appeared in the D&F Memo (*i.e.*, Ambiguity #1–Ambiguity #12).  AR 952 n.1.  The Court will do the same in this opinion. The CO also clarifies, in the SDD, that the D&F Memo cited to "draft RFQ section numbers," and he provides a "crosswalk . . . with strikethroughs showing the original citations."  AR 953.  The crosswalk indicates that the D&F Memo incorrectly cited RFQ sections: 3.2.3 instead of 3.2.2; 3.4.1 instead of 3.4.4; 3.4.2 instead of 3.4.6; 3.4.3 instead of 3.4.7; 3.4.6 instead of 3.4.10; and 3.4.8 instead of 3.4.11.  *Id.*  Unless otherwise noted, the bolded "**Ambiguity**" references are bolded in the SDD.  *See* AR 953–54.

11

Second, the CO observes that "[a]nother key conflicting requirement exists between **Ambiguity #2** (RFQ section 3.1.3) (AR 71), **Ambiguity #6** (RFQ sections 3.3.1 (AR 73), 3.3.3 (AR 73-74)), PWS section 7.5 (AR 123-124), and the Q&A document (AR 222) regarding personnel certification requirements." AR 954. Specifically, during the Q&A process, in response to a contractor request that the Agency "[p]lease provide an updated PWS to include language or clarify this requirement," GSA indicated that PWS section 7.5 identified the requirements for all key positions, including Project Managers and Lead Developers. *Id.* (italicization omitted) (citing AR 222). The SDD states, however, that PWS section 7.5 "does not specify the certifications required for contractor personnel." *Id.* Describing the impact of this ambiguity, the CO explains that contractors were "forced . . . to make assumptions about certification requirements when preparing their proposals, leading to inconsistent responses across offerors." *Id.* In addition, this ambiguity "was further complicated" by the regulatory change from AFMAN 17-1303 to DAFMAN 17-1305, which led to changes in the underlying certification requirements. *Id.* The CO concludes his analysis of this ambiguity by noting that it "meant contractors were being evaluated against standards different from those reflected in the original solicitation, as contractors had based their submissions on the original requirements while the Government applied updated standards that had not been communicated." *Id.*

Third, the SDD expresses concern about "vague evaluation criteria scattered throughout the RFQ, directly relating to **Ambiguity #12** (RFQ [section] 3.4.11 - 'more favorability ratings') using terms like 'more favorably,' 'more closely,' and 'additional weight' without clear definitions." *Id.* As the SDD explains, RFQ section 3.3.7.1 "states that lower risk staffing approaches 'may be rated more favorably' and proposals 'may be evaluated more favorably' when Key Personnel exceed minimum qualifications," without giving further detail as to what "more

favorably" means. *Id.* (quoting AR 75). Likewise, RFQ section 3.4.4.1 "indicates that past performance 'more closely related' to the procurement scope 'will be given additional weight,'" without explaining what, exactly, constitutes a close relation. *Id.* (quoting AR 76). In describing the "significant problems" created by "[t]hese ambiguous criteria[,]" the CO notes that "[d]uring the In-depth Feedback through Open Reporting Methods (INFORM) process, contractors reported confusion about what the Government was seeking." *Id.* Further, Octo Metric's bid protest at the GAO, and GSA's subsequent decision to take corrective action, "raised reasonable concerns the Government failed to properly apply its own evaluation criteria" in that "it did not give 'additional weight' to closely related past performance or evaluate 'more than three' Similar Contracts/Task Orders 'more favorably.'" *Id.*

3.    Feasibility of Re-Evaluation

The SDD concludes with the CO's analysis of "whether corrective action or additional re-evaluation could remedy these deficiencies." AR 955. The CO determined that such alternative actions could not do so because of "three insurmountable obstacles": (1) submission of proposals based on mutually exclusive interpretations created by contradictory RFQ requirements; (2) a gap between what the offerors proposed and what the Air Force actually needs due to the evolution of technical requirements; and (3) inconsistent results created by vague evaluation criteria. AR 955–56. Upon considering "whether targeted amendments to the original Solicitation and re-evaluation of" the previously submitted proposals "could salvage the procurement," the CO "concluded that the extensive changes would require essentially new proposals to avoid violating fair competition principles." AR 956. As summarized by the SDD, the CO determined that "the original Solicitation no longer represented the Government's actual needs, contradictory requirements had irreparably compromised competitive fairness, no corrective action could cure these fundamental defects, and proceeding would result in cardinal changes to the Solicitation and risk successful

performance." *Id.* Thus, the CO found it was in the Government's best interest to terminate and re-solicit "with updated technical requirements, clear evaluation criteria, and equal competitive opportunity." *Id.*

### C.    This Litigation

After the Government filed the SDD, CSI filed a Motion to Compel and/or to Complete the Post-Remand Administrative Record. ECF No. 65 at 1. In that Motion, CSI sought production of two documents cited in the SDD: (1) the draft RFQ and (2) the revised PWS. *Id.* At CSI's request, and after the Government filed its Response to the Motion to Compel, *see* ECF No. 67, the Court held a status conference regarding the Motion on September 8, 2025. *See* Min. Entry, Sept. 8, 2025. The Court granted CSI's oral request at the conference to submit supplemental briefing on the issue of whether the Agency waived the deliberative process privilege and thus needed to include the draft RFQ and revised PWS in the Administrative Record. *See* Order, Sept. 8, 2025. Because CSI's deadline to file its Third Amended Complaint was only days away, the Court ordered the parties to submit this briefing that same day. *See* Pl.'s Submission of Suppl. Case Citations Supp. Mot. Compel and/or Complete Admin. R., ECF No. 69; Def.'s Suppl. Submission in Opp'n to Pl.'s Mot. Compel, ECF No. 70. On September 10, 2025, the Court denied CSI's motion to compel production of the draft RFQ and revised PWS. *See CAN Softtech, Inc. v. United States* ("*CSI II*"), No. 24-1009, 2025 WL 2753141, at *1 (Fed. Cl. Sept. 10, 2025). In that Order, the Court briefly summarized its rationale, noting that a more fulsome analysis would be included in this opinion. *Id.* at *1 n.1.

The next day, on September 11, 2025, CSI filed its Third Amended Complaint for Declaratory and Injunctive Relief, asserting two claims for relief. ECF No. 73. First, CSI alleges that GSA's termination and re-solicitation decision was arbitrary and capricious. *Id.* ¶¶ 113–55.

Second, CSI alleges that the Agency breached the implied duty of good faith and fair dealing by offering a pretextual rationale for its decision.  *Id.* ¶¶ 157–62.

Also on September 11, 2025, CSI filed another Motion to Supplement and/or Complete the Administrative Record.  *See* ECF No. 72.  CSI seeks to add to the Administrative Record a document it claims is the PWS for the current bridge task order for the Air Force's ELFF requirement (the "2025 Bridge Task Order"), which was issued on January 31, 2025 (the "2025 Bridge PWS").  *Id.* at 1.  CSI argues that supplementation is necessary because the 2025 Bridge PWS (1) undermines the materiality of the PWS revisions discussed in the SDD, and (2) suggests that GSA's stated rationale for the termination and re-solicitation decision is pretextual.  *Id.* at 6–10.  Alternatively, CSI asserts that the Administrative Record should be completed with the 2025 Bridge PWS because GSA necessarily, or reasonably should have, considered it when preparing the SDD.  *Id.* at 10.  In response, the Government argues that the 2025 Bridge PWS is not (1) authenticated, (2) necessary for effective judicial review as its purpose was to maintain the status quo, nor (3) part of the Administrative Record because the CO did not consider it when making the termination decision.  Def.'s Resp. in Opp'n to Pl.'s Mot. to Suppl. and/or Complete Admin. R. at 1–4, ECF No. 76.  The Government attached to its response the declaration of the contracting officer assigned to the 2025 Bridge Task Order, explaining why substantive changes were not made to the 2025 Bridge PWS.  *See* ECF No. 76-1.  To the extent the Court grants CSI's supplementation request, the Government similarly requests that the Court supplement the record with this declaration.  *See* Dec. 11, 2025 Oral Arg. Tr. at 35:23–36:5, ECF No. 87.  CSI addressed the Government's response in its Combined Response and Reply in Support of its Second Motion for Judgment on the Administrative Record and Reply in Support of CSI's Motion to Supplement,

which it filed on November 24, 2025.  *See* ECF No. 84 at 31–32.  CSI's motion is now fully briefed.

On September 25, 2025, the parties filed renewed Motions for Judgment on the Administrative Record.  *See* Pl.'s Second Mot. for J. on Admin. R. and Supp. Mem., ECF No. 75; Def.'s Renewed Cross-Mot. for J. on Admin. R., ECF No. 77.  CSI argues that the termination decision is arbitrary and capricious even considering the further explanation in the SDD because the SDD: (1) fails to reasonably assess the materiality of the PWS changes, ECF No. 75 at 32–34; (2) includes post-hoc rationalization in its discussion of the modified deliverables as well as the removal and introduction of PWS requirements, *id.* at 36–39; and (3) lacks a rational basis for asserting that termination is necessary to resolve RFQ ambiguities because the issues are unambiguous and had no material impact on the competition, *id.* at 39–41.  CSI further argues that the termination decision reflects a breach of the implied duty of good faith and fair dealing because GSA's stated rationale is pretextual.  *Id.* at 41–44.  In its renewed cross-motion, the Government argues that GSA's termination and re-solicitation decision is coherently and reasonably explained by the record because: (1) GSA reasonably believed termination and re-solicitation were necessary to ensure the Government received its actual needs and to ensure fair competition, ECF No. 77 at 5–10; and (2) the explanation in the SDD is not a post-hoc rationalization, *id.* at 10–12.[6]  The

---

[6] CSI suggests the Court should not consider the Government's renewed cross-motion because the motion does not comply with the Rules of the United States Court of Federal Claims ("RCFC") as it lacks a statement of facts and question presented.  ECF No. 84 at 7 (citing RCFC 52.1(a) and RCFC 5.4(a)(2)(C)).  Because the Government included a statement of facts and question presented in its original cross-motion, *see* Def.'s Mot. Dismiss and Cross-Mot. for J. on the Admin. R. at 7–14, ECF No. 50, and the only relevant factual change on remand is the addition of the SDD (which the Government's renewed cross-motion describes and cites to), the Court will consider the arguments in the Government's renewed cross-motion regardless of any technical non-compliance.  *See, e.g.*, ECF No. 77 at 6 (discussing the SDD's description of the "breadth and material nature of required changes to the outdated PWS"); *see also* ECF No. 84 at 8 (CSI noting that the Government's renewed cross-motion "merely summarizes the contents of the SDD").

Government also argues that CSI fails to demonstrate a breach of the implied duty of good faith and fair dealing because it has not offered sufficient evidence to overcome the presumption of good faith that attaches to agency action. *Id.* at 12–14. The parties filed their simultaneous responses on November 24, 2025. *See* ECF No. 84; Def.'s Resp. to Pl.'s Second Mot. for J. on the Admin. R., ECF No. 85. The Court heard oral argument on December 11, 2025. *See* Min. Entry, Dec. 11, 2025. The renewed dispositive motions are now fully briefed.

## II. LEGAL STANDARDS

### A. Motions to Complete the Administrative Record

"Different standards govern motions to complete and motions to supplement the administrative record." *ELB Servs., LLC v. United States*, 172 Fed. Cl. 233, 241 (2024). A motion to complete the administrative record seeks to add documents to the record that were generated or considered by the relevant decisionmaker but not included in the administrative record. *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019). Because the Government's "designation of an administrative record is entitled to a presumption of completeness," to prevail on a motion to complete, a plaintiff must provide "clear evidence" that the administrative record lacks information that was "generated or considered by the agency during the procurement and decisionmaking process." *Id.*; *see also Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238–39 (Fed. Cir. 2002) (explaining that courts presume government officials exercise their duties in good faith).

### B. Motions to Supplement the Administrative Record

A motion to supplement the administrative record, on the other hand, seeks to add materials that were not considered by the agency in reaching its decision but are nevertheless necessary to permit the Court's full evaluation of the agency's decision. *Poplar Point*, 145 Fed. Cl. at 494. To supplement the record, a plaintiff must make a higher showing than that necessary to prevail on a

17

motion to complete. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (explaining that parties have a "limited" ability to supplement the administrative record). This is because, in a case applying the Administrative Procedure Act's ("APA") standard of review, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Thus, the administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381.

Courts have found supplementation appropriate where the supplemental material is "necessary to help explain an agency's decision," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 & n.10 (2004) (citing *Camp*, 411 U.S. at 142–43); helps explain what the CO considered in reaching a decision, *Precision Standard, Inc. v. United States*, 69 Fed. Cl. 738, 747 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007); or otherwise "correct[s] mistakes and fill[s] gaps" in the record, *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 130 (2018). Supplementation is also generally appropriate when the extra-record material contains "relevant information that by its very nature would not be found in an agency record[,]" including "evidence of bad faith." *Orion*, 60 Fed. Cl. at 343–44.

### C.    Motions for Judgment on the Administrative Record

RCFC 52.1(c) governs motions for judgment on the administrative record. Such motions essentially call for "an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike the standard for summary judgment, the standard for judgment on the administrative record involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged agency decision] was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a

genuine dispute of material fact does not prevent a court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357; *Martinez*, 77 Fed. Cl. at 324.

**D.      Bid Protest Standard of Review**

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, confers on this Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Act requires this Court to review the agency's action "pursuant to the standards set forth" in the APA.  *Id.* § 1491(b)(4); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (explaining that this Court reviews bid protests under the APA's arbitrary and capricious standard).  Accordingly, the Court asks whether a procuring agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To prevail, a protestor "must show a significant, prejudicial error in the procurement process."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").  Under the APA standard, an agency action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Procurement officials "are given broad discretion" in their procurement duties; when a procurement officer makes a reasonable decision within the scope of that discretion, "a court may not substitute its judgment for that of the agency."  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).  Thus, a protestor "bears a heavy burden" to overcome the presumption of

regularity courts afford to an agency decision. *Impresa*, 238 F.3d at 1338. If the "agency provided a coherent and reasonable explanation of its exercise of discretion," the agency action should be sustained. *Id.* at 1333 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). This standard applies equally when reviewing an agency's corrective action decision. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 991–92 (Fed. Cir. 2018).

### III. DISCUSSION

This opinion proceeds in six parts. First, the Court further explains its previous decision denying CSI's Motion to Compel and/or to Complete the Post-Remand Administrative Record with the draft RFQ and revised PWS. Second, the Court grants CSI's Motion to Supplement the Administrative Record with the 2025 Bridge PWS because CSI has established that it is necessary for effective judicial review. Third, the Court grants the Government's request to supplement the record with the declaration discussing the 2025 Bridge Task Order because it is necessary for effective judicial review. Fourth, the Court holds that GSA provided a coherent and reasonable explanation for its termination and re-solicitation decision because the Agency reasonably concluded that the revisions to the PWS will create cardinal changes that cannot be implemented through targeted amendments to the Solicitation. Fifth, the Court holds that the Agency did not breach the covenant of good faith and fair dealing because CSI has not established pretext by clear and convincing evidence. Sixth, the Court finds that CSI is not entitled to injunctive relief because it has not succeeded on the merits.

### A.    The Draft RFQ and Revised PWS Are Not Part of the Administrative Record.

The Court previously denied CSI's motion to complete the Administrative Record with the draft RFQ and revised PWS. *See CSI II*, 2025 WL 2753141, at *2. In that order, the Court held that the draft RFQ and revised PWS both fell within the category of "documents reflecting proposed revisions of the Solicitation and/or GSA's effort to effect the changes suggested in the

D&F Memo," which this Court previously held were properly not part of the Administrative Record as they are privileged, internal, pre-decisional, and deliberative documents. *Id.* at *1 (quoting *CAN Softtech, Inc. v. United States* ("*CSI III*"), 173 Fed. Cl. 480, 483 (2024), *recons. denied*, 174 Fed. Cl. 412 (2024)). The Court also held that CSI had not demonstrated that the Government waived the privilege with respect to these documents. *Id.* at *2. The Court, however, provided only a brief summary of its reasoning to facilitate expedited review of CSI's motion prior to the deadline for CSI's Third Amended Complaint. *Id.* at *1 n.1. The Court now provides a more fulsome explanation.

       1.      <u>Privileged Documents Are Not Part of the Administrative Record.</u>

Privileged materials, including those covered by the deliberative process privilege, are generally "excluded from the administrative record—indeed, they are not even properly considered part of the administrative record in the first instance." *CSI III*, 173 Fed. Cl. at 485 (collecting cases). Under APA review, "the reasonableness of the agency's action 'is judged in accordance with its stated reasons,'" and "[t]he 'actual subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior.'" *Id.* at 486 (first quoting *Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 23, 27 (D.D.C. 2009); and then quoting *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279–80 (D.C. Cir. 1998)). Accordingly, "pre-decisional, deliberative documents in an APA-review case are 'immaterial' and necessarily irrelevant to the reasonableness of the agency's action." *Id.* (quoting *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)).

     The deliberative process privilege, as "a subset of the executive privilege," *Fairholme Funds, Inc. v. United States*, 117 Fed. Cl. 365, 368 (2014), protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated,'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S.

132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (D.C. Cir. 1967)). The purpose of the privilege is to "prevent injury to the quality of agency decisions," *id.* at 151, by encouraging "open, frank discussion between subordinate and chief concerning administrative action," *In re United States*, 321 F. App'x. 953, 958 (Fed. Cir. 2009) (quoting *Kaiser Aluminum & Chem. Corp. v. United States*, 141 Ct. Cl. 38, 48 (1958)).  The privilege applies to information that is both (1) pre-decisional and (2) deliberative.  *Id.*  Pre-decisional information includes "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* at 959 (quoting *Moye, O'Brien, O'Rourke, Hogan & Pickert v. National R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004)).  A document is deliberative where it "reveal[s] the mental processes of decision makers." *Id.* (quoting *Moye*, 376 F.3d at 1277).

Even if a document is privileged, however, disclosure may be appropriate in an APA-review case when the plaintiff asserts that the Government acted in bad faith.  *CSI III*, 173 Fed. Cl. at 487 (collecting cases).  Although more appropriately considered as a request to supplement the administrative record, the movant must "provide (1) clear evidence that the Government improperly withheld the documents from the record, or (2) 'a "reasonable factual predicate"' for an allegation that the agency engaged in bad faith, improper behavior, or bias." *Id.* (quoting *Xerox Corp. v. United States*, No. 21-1807, 2021 WL 9563553, at *6 (Fed. Cl. Dec. 17, 2021)).

      2.     <u>The Draft RFQ and Revised PWS Are Privileged, Internal, Pre-Decisional, and Deliberative Documents.</u>

In ruling on an earlier motion to complete or supplement the Administrative Record in this case, the Court held that "[d]ocuments reflecting proposed revisions of the Solicitation and/or GSA's effort to effect the changes suggested in the D&F Memo," *CSI III*, 173 Fed. Cl. at 483

(alteration in original) (internal quotation marks and citation omitted), are "prototypically pre-decisional and deliberative," and therefore properly excluded from the Administrative Record, *id.* at 488.  Both the draft RFQ and revised PWS fall directly within this category of privileged, internal, pre-decisional, and deliberative documents that the Court already held are not part of the Administrative Record even if the Agency generated or considered them in reaching its decision. Indeed, both "[d]ocuments reflect[] proposed revisions of the Solicitation" as part of "GSA's effort to effect the changes suggested in the D&F Memo."  *Id.* at 483; *see also* AR 953 (providing a crosswalk of the draft RFQ section numbers cited in the D&F Memo against the RFQ section numbers in the existing Solicitation); AR 950 (describing the changes made in the revised PWS to accurately reflect the Air Force's needs).  Thus, both documents, as drafts, necessarily do not embody the Agency's final decision regarding the substance and form of the intended re-procurement.  *See CSI III*, 173 Fed. Cl. at 488.  At this stage, where the re-procurement is being planned and the final amended solicitation has not yet been published, the documents are inherently pre-decisional and deliberative.  *Id.* (noting that "any draft revisions to the as-of-now unreleased, revised solicitation . . . are prototypically pre-decisional and deliberative").

In an effort to distinguish the draft RFQ and revised PWS from this Court's earlier conclusion, CSI argues that both documents contain factual material not protected by the deliberative process privilege, or alternatively, that the Government waived any such privilege by citing the documents in the SDD.  *See* ECF No. 65 at 7–9.  Both arguments fail.

Generally, "'factual or investigative material' is not protected by the deliberative process privilege 'except as necessary to avoid indirect revelation of the decision-making process.'"  *CSI III*, 173 Fed. Cl. at 489 (quoting *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 134 (2006)).  The portions of the draft RFQ and revised PWS referenced in the SDD cannot reasonably

23

be considered factual or investigative material.  *See* AR 950–53.  While the Court previously required the Government to produce a redacted version of a draft memo, it did so because the draft memo was attached to a document in the record and contained a recitation of facts relevant to the timeline of an alleged Procurement Integrity Act violation that was incorporated by reference (but not otherwise described) in that document.  *CSI III*, 173 Fed. Cl. at 489–90.  The facts that the Court ordered to be disclosed did not reflect advisory opinions, recommendations, or deliberations, and did not reveal—directly or indirectly—the Government's decisionmaking process.  *Id.* Conversely, as discussed above, the draft RFQ and revised PWS fall squarely within the ambit of the deliberative process privilege.  *See* AR 950, 953.  That the CO referenced the draft RFQ and revised PWS in the SDD does not convert those drafts into factual or investigative information excluded from the privilege.

CSI's argument that the Government's high-level references to portions of the draft RFQ and revised PWS in the SDD constitute waiver of the deliberative process privilege is similarly unpersuasive.  *See* ECF No. 65 at 8–9.  These references are minimal and the SDD did not expressly adopt the underlying reasoning of either document.  *See* AR 950–53.  In analyzing similar arguments, courts distinguish between "reference to a report's conclusions [and] adoption of its reasoning" noting "it is the latter that destroys the privilege." *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1197 (D.C. Cir. 1991).  Indeed, "minor references to" a privileged document "cannot be said to be an express adoption or incorporation." *Tigue v. Dep't of Just.*, 312 F.3d 70, 81 (2d Cir. 2002).  Nor does a "casual allusion . . . to subject matter discussed in some pre-decisional, intra-agency memoranda" waive the privilege. *Common Cause v. IRS*, 646 F.2d 656, 660 (D.C. Cir. 1981).

The cases CSI cites in its motion are distinguishable because none involved a similar fact pattern. *See* ECF No. 65 at 5 (citing *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 585–86 (2012) (waiver of privilege due to inadvertent production and failure to timely rectify the error); *Oasis Int'l Waters, Inc. v. United States*, 110 Fed. Cl. 87, 116–18 (2013) (similar); *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1303–04 (Fed. Cir. 2006) (distinguishing between "factual" and "opinion" work product in analyzing advice-of-counsel defense to a charge of patent infringement)). The cases CSI cites in its supplemental briefing similarly fail to support CSI's position. *See* ECF No. 69 at 1–2 (citing *City of Wilmington v. United States*, 141 Fed. Cl. 558, 564–66 (2019) (waiver found where privileged document was expressly incorporated into three different publicly available sources); *Alpha I, L.P. ex rel Sans v. United States*, 83 Fed. Cl. 279, 290–91 (2008) (finding waiver as to privileged information in documents that the Government produced to plaintiffs in other cases or documents containing substantially similar privileged information as contained in documents produced to plaintiff in the case at bar); *Fairholme Funds, Inc. v. United States*, 128 Fed. Cl. 410, 434 n.8, 442–43 (2016) (finding that plaintiff's need for privileged information outweighed government's interest in non-disclosure, without making finding on waiver), *vacated in part sub nom.*, *In re United States*, 678 F. App'x 981 (Fed. Cir. 2017)).

Unlike these cases, there is no allegation that the Government publicly released the draft RFQ or revised PWS, nor is there an allegation that the Government previously produced the draft RFQ or revised PWS, offered testimony about them, or disclosed substantially similar information in this or any other litigation. Instead, the SDD merely references the draft RFQ and revised PWS for the limited purposes of correcting a clerical error in the D&F Memo and explaining at a high level the PWS changes that the Agency believes are necessary based on the problems identified

25

with the current PWS and RFQ. *See, e.g.*, AR 950 (noting "[t]he revised PWS contains 36 modifications that fundamentally transform the procurement"); AR 951 (explaining the revised PWS "introduces significant new requirements"); *id.* (describing that the revised PWS "eliminates manual security documentation, requiring contractors to use eMASS . . . instead"); AR 953 (referencing the draft RFQ to correct a clerical error in the section numbers referenced in the D&F Memo). These are prototypical of "minor references," *Tigue*, 312 F.3d at 81, or "casual allusion[s]," *Common Cause*, 646 F.2d at 660, that do not constitute waiver. Nowhere in the SDD did the CO adopt or incorporate either document. Accordingly, the Government has not waived the privilege attaching to the draft RFQ and revised PWS.

Finally, the Court notes that compelling the Agency to produce internal drafts of solicitation documents prior to the publication of the final solicitation could harm the Government by chilling candor in internal agency deliberations and diminishing the quality of the procurement decisionmaking process. As discussed, the deliberative process privilege exists to preserve the quality of internal agency decisionmaking by encouraging candor and openness within internal agency discussions. *In re United States*, 321 F. App'x at 958; *Sears*, 421 U.S. at 151. "[I]f a document is deliberative and predecisional some harm to the consultative process is presumed to result from disclosure." *Dairyland Power Coop. v. United States*, 77 Fed. Cl. 330, 341 (2007) (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001)). The Court, therefore, denied CSI's motion to compel production of the draft RFQ and revised PWS.

**B.   The Court Grants CSI's Motion to Supplement the Record with the 2025 Bridge PWS.**

CSI also seeks to supplement or complete the Administrative Record with the 2025 Bridge PWS. *See* ECF No. 72 at 1. According to CSI, the 2025 Bridge PWS is necessary to permit effective judicial review of the materiality of the PWS changes identified in the SDD and CSI's

allegation that the Agency breached the covenant of good faith and fair dealing.  *Id.* at 6–10.  In the alternative, CSI asserts that the Court should order completion of the record to include the 2025 Bridge PWS because GSA necessarily, or reasonably should have, considered the 2025 Bridge PWS in drafting the SDD.  *Id.* at 10.  The Court finds that the record should be supplemented, rather than completed, with the 2025 Bridge PWS.

   1.  CSI Has Not Met Its Burden to Demonstrate the Record Should Be Completed with the 2025 Bridge PWS.

Taking CSI's arguments in reverse order, the Court first considers whether the record should be completed with the 2025 Bridge PWS.  *See Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 168 (2011) ("A complete administrative record is the predicate to meaningful and effective judicial review of agency action, and it is that complete record that is subject to supplementation[.]").  To demonstrate that completion is appropriate, CSI must provide "clear evidence" that the 2025 Bridge PWS was "generated or considered by the agency" in making its decision to terminate CSI's Task Order and re-solicit the Air Force's ELFF requirement.  *Poplar Point*, 145 Fed. Cl. at 494.  CSI implicitly concedes, however, that the 2025 Bridge PWS was not considered by the Agency in making the termination and re-solicitation decision because CSI acknowledges that the 2025 Bridge PWS did not exist at that time.  *See* ECF No. 72 at 10 (acknowledging that "the 2025 Bridge PWS post-dates the D&F Memo"); AR 773–75 (indicating the termination and re-solicitation decision was made between April–June 2024); ECF No. 76-1 ¶ 2 (indicating the 2025 Bridge Task Order was awarded on January 31, 2025).  This fact alone is enough to deny CSI's motion to complete.  *See Poplar Point*, 145 Fed. Cl. at 494.

Even if it were not, CSI's contention that completion of the record is proper because "GSA necessarily considered (or reasonably should have considered) the 2025 Bridge PWS when it made the representations in the SDD concerning its current requirements and deliverable needs," ECF

No. 72 at 10, is both unsupported by the record and incorrect as a matter of law.  Putting aside the fact that the SDD does not a represent a *new* agency decision but instead further describes the basis for the *existing* agency decision, *see CSI I*, 177 Fed. Cl. at 401 (citing *Camp*, 411 U.S. at 143), CSI offers no evidence, let alone "clear evidence," that the CO considered the 2025 Bridge PWS when drafting the SDD.  *Poplar Point*, 145 Fed. Cl. at 494 (requiring "clear evidence" that the decisionmaker "generated or considered" the document in making the challenged agency decision).  Further, even if CSI were correct that GSA "reasonably should have considered" the 2025 Bridge PWS when drafting the SDD, ECF No. 72 at 10, CSI does not explain why this would justify completion of the record.  The standard for completing the administrative record is not what the decisionmaker *should* have generated or considered in making its decision; the standard is what the decisionmaker *actually* generated or considered.  *Poplar Point*, 145 Fed. Cl. at 494; *Comint*, 100 Fed. Cl. at 167.  Thus, CSI has not demonstrated that the record should be completed with the 2025 Bridge PWS.

> 2.    CSI Has Established that the 2025 Bridge PWS Is Necessary for Effective Judicial Review.

The Court next turns to CSI's alternative argument that the Administrative Record should be supplemented with the 2025 Bridge PWS.  *See* ECF No. 72 at 6–10.  CSI has demonstrated that the 2025 Bridge PWS is necessary for effective judicial review of its arguments regarding both the materiality of the PWS changes discussed in the SDD and alleged pretext.  First, the 2025 Bridge PWS is necessary for evaluating materiality because the omission of the PWS changes discussed in the SDD from the 2025 Bridge PWS could undermine the Agency's materiality determination.  Second, CSI has established the factual predicate necessary for supplementing the record with the 2025 Bridge PWS for purposes of evaluating its pretext claim because the omission of the PWS changes is, on its face, arguably inconsistent with the SDD's stated rationale for canceling and re-

soliciting the RFQ.  Thus, the Court grants CSI's request to supplement the record with the 2025 Bridge PWS.

Supplementation is appropriate where "the omission of extra-record evidence precludes effective judicial review." *Axiom*, 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  Although "[t]he focus of judicial review of agency action remains the administrative record," a court may consider extra-record evidence where the movant demonstrates that "the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381.  Accordingly, the movant must explain "why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether [the challenged agency decision] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018).  There is, however, an important "distinction between the APA standard of review, which focuses on the merits of the bid protest, and the *Axiom* standard of review, which focuses narrowly on the supplementation of the administrative record issue." *Voith Hydro, Inc. v. United States*, 142 Fed. Cl. 233, 236 (2019).  Indeed, "[t]he *Axiom* standard serves the purpose of ensuring that an APA review of the procurement proceeds correctly, and that the trial court does not engage in a de novo review of the proposals before the procuring agency." *Id.* (citing *Axiom*, 564 F.3d at 1380).

In applying the *Axiom* standard, courts consider whether the proffered extra-record evidence demonstrates, for example, that the record does not accurately reflect what transpired within the agency or, instead, whether the evidence merely challenges the agency's determination with the opinions of the movant or a third party.  Because "[a]llowing a protest to be decided upon an [administrative record] which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review," *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344,

29

366 (2009), supplementation may be appropriate where the movant seeks to introduce evidence that reflects the Government's own position on relevant issues. *See L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 356 (2010) (granting supplementation with documents reflecting "the work product of the Government's own investigations into several issues bearing on the instant protest"), *amended on recons. in part*, 98 Fed. Cl. 45 (2011). A movant generally may not, however, supplement the record with bald "contradictory statements" to an agency's own determination, *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 181 (2022), nor may a movant "merely search[] to bolster the basis for [its] claims," *Health Net Fed. Servs., LLC v. United States*, 168 Fed. Cl. 1, 21 (2023).

Supplementation may also be appropriate where the movant alleges bad faith, bias, or pretext, "because 'rare indeed would be the occasions when evidence of bad faith will be placed in the administrative record.'" *Terry v. United States*, 96 Fed. Cl. 156, 164 (2010) (quoting *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004)). A movant seeking supplementation on the basis of such allegations "need not, however, meet the same burden of proof that it ultimately must carry on the merits." *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 748 (2014). Rather, it is sufficient that the movant present "well-grounded allegations" of bad faith, bias, or pretext. *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010). Thus, to meet the supplementation standard, it is sufficient that the movant makes an adequate threshold showing of bad faith, bias, or pretext, even if the Government may be able to rebut such a showing on the merits. *Id.* at 334. To make an adequate threshold showing, "the proffered extra-record material must indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual." *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120,

30

130 (2010).  Conversely, where the movant's arguments "go more to the merits of whether the procurement decision by [the agency] was flawed . . . than to any allegations of bias or favoritism," supplementation is improper.  *Off. Depot, Inc. v. United States*, 94 Fed. Cl. 294, 299 (2010); *see also Tech Sys., Inc. v. United States*, 97 Fed. Cl. 262, 266 (2011) (concluding that the Government's arguments refuting the connection between any alleged bias and the procurement decision were "best left to the merits determination").

Applying these standards here, the Court finds that the 2025 Bridge PWS is necessary for effective judicial review of both GSA's materiality determination and CSI's pretext allegation. First, as CSI argues, *see* ECF No. 72 at 6–9, that GSA issued the 2025 Bridge Task Order without making any of the PWS changes discussed in the SSD, at least nine months after the Agency first discovered the necessity of such changes, appears facially to contradict GSA's determination that the necessary changes to address the outdated PWS at issue here were sufficiently material to warrant termination and re-solicitation.  *Compare* AR 773 (indicating GSA discovered the outdated PWS requirements during the re-evaluation from February–April 2024), *and* AR 949 (same), *with* ECF No. 76-1 ¶ 2 (indicating the 2025 Bridge Task Order was awarded on January 31, 2025, and included all of the outdated PWS requirements discussed in the SDD).  Importantly, the 2025 Bridge PWS is not simply a "contradictory statement[]" from CSI or a third party challenging the Agency's assessment of the materiality of the PWS changes on the merits. *Hydraulics Int'l*, 161 Fed. Cl. at 181.  It is a document created by GSA that could arguably undermine the Agency's stated position on an issue relevant to the outcome of this protest.  *See L-3 Commc'ns*, 91 Fed. Cl. at 356.  Under these circumstances, the omission of directly relevant evidence reflecting the Agency's own position would "frustrate effective judicial review" by

potentially allowing the protest to be decided upon a record "which does not reflect what actually transpired." *AshBritt*, 87 Fed. Cl. at 366.

Second, CSI has established the factual predicate necessary for supplementing the record with the 2025 Bridge PWS based on its allegation that the Agency's stated rationale was pretextual. Based on a review of the documents alone, there is arguably a "latent inconsistency" between GSA's assertion in the SDD that the PWS requirements are outdated and require re-solicitation using a revised PWS, and the 2025 Bridge PWS's inclusion of the same requirements at least nine months after the Agency discovered they were outdated. *Madison Servs.*, 92 Fed. Cl. at 130.

The Government argues, in opposition to the supplementation request, that the 2025 Bridge PWS was not intended to include the changes discussed in the SDD because the 2025 Bridge PWS was issued to provide an interim stop-gap solution and avoid a lapse in services during the pendency of this protest. *See* ECF No. 76 at 4 (citing ECF No. 76-1 ¶¶ 7, 9). Such an argument goes to "the APA standard of review, which focuses on the merits of the bid protest," rather than to "the *Axiom* standard of review, which focuses narrowly on the supplementation of the administrative record issue." *Voith Hydro*, 142 Fed. Cl. at 236. In holding that CSI has met its burden for supplementing the record, the Court makes no determination as to whether CSI has met its burden on the merits. The Court will consider the Government's argument regarding the purpose of the 2025 Bridge PWS in addressing the merits of CSI's challenge to the reasonableness of the SDD. *See infra* §§ III.D.1, III.D.3. Regardless of whether CSI can ultimately prevail on the merits, the Court cannot meaningfully review CSI's claims unless the record is supplemented with the 2025 Bridge PWS.

3.    <u>Although the 2025 Bridge PWS Is Not Authenticated, the Government Does Not Contest the Key Fact for Which CSI Offers the Document.</u>

The Government argues that the 2025 Bridge PWS should not be included in the record because CSI does not certify or otherwise authenticate the document.  ECF No. 76 at 1.  The Government clarifies that it did not publish the 2025 Bridge PWS publicly and that the CO for the 2025 Bridge Task Order did not authorize disclosure of the document to CSI.  *Id.* at 2 (citing ECF No. 76-1 ¶¶ 10–11).  Further, the Government explains that the document CSI offers is a non-final draft version of the 2025 Bridge PWS.  *Id.*  Based on these facts, the Government suggests CSI may have obtained the document through unauthorized means.  *Id.*

Even where a court determines that extra-record evidence is necessary for effective judicial review, the court must evaluate whether the evidence has "sufficient reliability or foundation to be admitted to the [Administrative Record]."  *L-3 Commc'ns*, 91 Fed. Cl. at 362; *see also Hydraulics Int'l*, 161 Fed. Cl. at 181 (denying supplementation with declaration of protestor's president regarding awardees' ability to meet solicitation requirements where declarant failed to establish sufficient basis for knowledge of such facts).  While CSI has not certified or authenticated the 2025 Bridge PWS, which the Government has clarified is a draft version, the Government concedes the key fact for which CSI seeks to invoke the 2025 Bridge PWS: that the 2025 Bridge Task Order is being performed without any of the PWS changes described in the SDD.  ECF No. 76-1 ¶¶ 8–9.  Thus, there is no genuine dispute as to whether the 2025 Bridge PWS, whether draft or final, incorporates the PWS changes discussed in the SDD, and the Court may consider that fact in evaluating CSI's claims on the merits.  *See Etchey v. United States*, 15 Cl. Ct. 152, 154 n.2 (1988) (considering documents that were not formally authenticated or certified where the parties "did not dispute the authenticity of the documents . . . or the facts that can properly be adduced from those documents"); *Metzinger v. United States*, 178 Fed. Cl. 781, 788 (2025) (finding

33

document admissible where "[n]either of [the plaintiff's] objections amounts to a dispute about the veracity of the [document]").

### C.    The Court Grants the Government's Request to Supplement the Record with the Miller Declaration.

The Government attaches to its opposition to CSI's Motion to Supplement and/or Complete the Administrative Record a declaration from the contracting officer for the 2025 Bridge Task Order, Jason R. Miller.[7]  *See* ECF No. 76-1.

The Government also cites the Miller Declaration in support of the substantive arguments made in its Renewed Cross-Motion for Judgment on the Administrative Record.  *See, e.g.*, ECF No. 77 at 13 (arguing that "[t]he 2025 Bridge PWS was issued to avoid a lapse in services during the pendency of this protest and was not intended to incorporate the changes" described in the SDD (citing ECF No. 76-1 ¶¶ 8–10)).  Although the Government did not file its own supplementation motion, it requested at oral argument that the Court supplement the record with the Miller Declaration if it granted CSI's Motion to Supplement.  *See* ECF No. 87 at 35:23–36:5; *see also Pitney Bowes*, 93 Fed. Cl. at 333 (treating the government's "proffer as a motion . . . to supplement the administrative record, and grant[ing] that motion").  CSI did not oppose this request.  *See* ECF No. 87 at 12:25–13:15.  Because the Court grants CSI's Motion to Supplement the record with the 2025 Bridge PWS, the Miller Declaration fills a gap in the Administrative Record, *Pinnacle Sols.*, 137 Fed. Cl. at 130, as it is "necessary to help explain" the agency's rationale for not implementing the PWS changes described in the SDD to the 2025 Bridge PWS, *Orion*, 60 Fed. Cl. at 343.  It is therefore necessary for effective judicial review.  *Id.*; *Pinnacle Sols.*, 137 Fed. Cl. at 130.  Thus, having granted CSI's request to supplement the record with the

---

[7] Mr. Miller is a different GSA contracting officer from Mr. Carman Arroyo, the contracting officer for the procurement at issue and the author of the D&F Memo and the SDD. *See* ECF No. 76 at 2–3; AR 956.

2025 Bridge PWS, the Court also grants the Government's request to supplement the record with the Miller Declaration.

**D.    GSA Provided a Coherent and Reasonable Explanation for its Decision to Terminate CSI's Task Order and Re-Solicit the Air Force's Requirement.**

The SDD coherently and reasonably explains the grounds for the Agency's termination and re-solicitation decision.  This Court reviews an agency's corrective action decision under the arbitrary and capricious standard.  *Dell*, 906 F.3d at 991–92.  Thus, the Court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Banknote*, 365 F.3d at 1351.  Where an agency does so, the Court "may not substitute its judgment for that of the agency."  *DynCorp*, 10 F.4th at 1311.  Here, the CO rationally determined that termination and re-solicitation were necessary because the outdated PWS requires cardinal changes that cannot be implemented through targeted Solicitation amendments or re-evaluation of the offerors' previously submitted proposals.  *See* AR 950–52, 955–56.

The SDD explains the following reasons for the Agency's termination and re-solicitation decision: (1) an outdated PWS requiring numerous changes, including elimination of the Three Core Deliverables and modification of seven others, removal of the General Ledger requirement, and introduction of significant new requirements; and (2) RFQ ambiguities that prevented fair competition and proper evaluation.  *See* AR 950–52.  CSI responds with three categories of argument.  First, CSI argues that, although the elimination of the Three Core Deliverables is consistent with the explanation offered in the D&F Memo, the SDD fails to reasonably assess the materiality of these deliverables.  ECF No. 75 at 32–36.  Second, CSI asserts that the Agency's reliance on the remaining PWS changes amounts to impermissible post-hoc rationalization, and, in any event, GSA similarly fails to assess the materiality of these changes.  *Id.* at 36–39.  Third,

CSI contends that the purported RFQ ambiguities identified in the SDD were not ambiguous and had no material impact.  *Id.* at 39–41.

The Court finds CSI's first two arguments unavailing, and it need not address the third. First, GSA's determination that the removal of the Three Core Deliverables constitutes a cardinal change, which CSI does not challenge as relying on post-hoc rationalization, is reasonable and therefore provides a rational basis for the Agency's decision.  Second, the SDD does not rely on any post-hoc rationalization because the remaining PWS changes provide an amplified articulation of the grounds discussed in the D&F Memo, and thus this further explanation is permitted by the Court's remand order.  Finally, GSA's analysis of the remaining PWS changes further reinforces its determination that the PWS changes required termination and re-solicitation.[8]  The Court takes each holding in turn.

> 1.  GSA Reasonably Determined that the Removal of the Three Core Deliverables Constitutes a Material Change.

The CO identified and explained the impact of the removal of "three important deliverables" from the outdated PWS.  AR 950.  The SDD explains that removal of the Three Core Deliverables cannot be resolved through targeted solicitation amendments or re-evaluation of proposals while ensuring that the Government obtains its actual needs and maintains competitive integrity.  AR 949–50.  CSI makes two primary arguments for why the SDD's discussion of the elimination of the Three Core Deliverables fails to articulate a coherent and reasonable explanation

---

[8] Because the Court concludes that the outdated PWS provides a rational basis for the Agency's decision, which provides an independent basis for GSA's decision, the Court need not consider the SDD's explanation of the additional ground for termination and re-solicitation—*i.e.*, the solicitation ambiguities.  *See* AR 952–54; June 10, 2025 Oral Arg. Tr. at 27:8–15, ECF No. 58 (CSI's acknowledgment that changed PWS requirements could constitute a rational basis for the Government's decision if properly demonstrated); *id.* at 65:15–19 (CSI's recognition that "the Government could justify a cancellation decision or a revision of the solicitation based on the changing need"); *Dell*, 906 F.3d at 991 (holding an agency's corrective action must be upheld if the court finds there is a rational basis).

for the Agency's termination and re-solicitation decision: that the SDD fails to (1) explain why the requirements are outdated; and (2) assess the materiality of these changes. *See* ECF No. 75 at 33–36. Neither argument is persuasive.

First, contrary to CSI's assertion, *id.* at 33, the SDD coherently and reasonably explains why the PWS requirements are outdated and therefore need to be revised. Specifically, the SDD explains that the outdated requirements "did not reflect the government's actual needs" because "the Air Force-provided PWS was already outdated when incorporated into the Solicitation." AR 949. Moreover, throughout the re-evaluation, the CO "discovered further revisions were necessary." *Id.*; *see also* AR 955 (noting that "[d]uring the second re-evaluation attempt, [the CO] discovered the September 2023 PWS no longer reflected current Air Force operational requirements"). While this Court previously held that the D&F Memo failed to explain "why [the PWS] requirements might be outdated," *CSI I*, 177 Fed. Cl. at 398, the SDD provides the coherent and reasonable explanation that the D&F Memo lacked. Specifically, it identifies and explains each of the changes required to meet the Air Force's current needs. CSI's argument that the SDD fails to explain why the PWS was outdated is therefore unavailing.

Second, CSI fails to establish that GSA lacked a rational basis for determining that the elimination of the Three Core Deliverables was sufficiently material to warrant termination and re-solicitation. As an initial matter, CSI seeks to turn the standard of review on its head by arguing that the Agency's assertion of materiality is "factually unsupported." ECF No. 75 at 33. But, as the Government correctly argues, it has no burden to establish the material impact of the PWS changes by some evidentiary threshold. ECF No. 85 at 7 (citing *Dell*, 906 F.3d at 991). Instead, it is CSI's burden to establish that GSA's determination was arbitrary and capricious. *Impresa*, 238 F.3d at 1338. CSI fails to meet that burden here.

The CO determined that the changes needed to the outdated PWS, including removal of the Three Core Deliverables, reflect "material scope changes [that] fundamentally alter[] the procurement's nature," and, therefore, "proceeding would result in cardinal changes to the Solicitation." AR 955–56. The cardinal change doctrine prohibits contracting agencies from circumventing competition by modifying contracts in a manner that impermissibly exceeds the scope of the work under the contract. *Aircraft Charter Sols., Inc. v. United States*, 109 Fed. Cl. 398, 410–11 (2013). The doctrine has been similarly applied in the bid protest context too. *See Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 19 (2022) ("In the bid protest context, we 'do[ ] not ask whether Government modifications breached a contract, but . . . instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition.'" (alterations in original) (quoting *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993)). To answer the relevant inquiry, the Court must consider the materiality of the changes. The materiality of a modification "is a matter of degree varying from one contract to another," and a materiality determination requires consideration of "the totality of the change" with "recourse to its magnitude as well as its quality." *Saddler v. United States*, 152 Ct. Cl. 557, 561 (1961). Accordingly, courts must give "just consideration to the . . . cumulative effect [of the changes] upon the project as a whole." *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 194 (1965).

The SDD explains that the outdated PWS requires elimination of "three important deliverables" that do not reflect the Air Force's needs: the "Program Performance Metrics" deliverable, the "Information Support Plan" deliverable, and the "Training Plan" deliverable. AR 950. The "Program Performance Metrics" deliverable "required contractors to establish, maintain, and routinely report product-oriented metrics to the [PMO], necessitating dedicated analytics

personnel and reporting infrastructure that contractors factored into their pricing." *Id.* The "Information Support Plan" deliverable "mandated reviewing, updating, and maintaining documentation aligned with [GTG-F] standards, requiring specialized expertise in information exchange protocols and continuous PMO coordination." *Id.* The "Training Plan" deliverable "required contractors to review, update, implement, and maintain the ELFF Training Plan in conjunction with other contract and government employees, including the development of training activities and collateral support materials to instruct users on system functionality." *Id.* The CO describes how "eliminating this CDRL removes entire training development work streams . . . that contractors priced but would never perform." *Id.* The SDD analyzes the cumulative impact—including both the magnitude and quality—of removing the Three Core Deliverables, observing that "[c]ombined, these three CDRLs represented recurring deliverables requiring specialized staff and labor hours—metrics analysts, GIG-compliant documentation specialists, and instructional designers—that contractors included in their proposals but would never actually need." AR 951. Thus, the CO determined that eliminating the Three Core Deliverables would constitute a cardinal change requiring cancellation and re-solicitation to avoid violating principles of fair competition. The CO's determination is both coherently explained and reasonable.

CSI argues that the SDD's reliance on the fact that the offerors' proposals addressed the Three Core Deliverables is insufficient support for the CO's analysis of materiality. *See* ECF No. 75 at 33–34. CSI points out that the offerors were required to address all PWS requirements in their proposal and that CSI addressed all 34 deliverables in a single one-and-a-half-page section. *Id.* at 33 (first citing AR 239–308; and then citing AR 246–47). Further, CSI notes that it addressed the Three Core Deliverables in approximately two sentences each. *Id.* (citing AR 247).

39

The Court agrees with CSI that, where the offerors are required to address all PWS requirements in their proposals, the mere inclusion in a proposal of content addressing a PWS requirement is insufficient on its own to demonstrate materiality. *Id.* at 33–34; *see Air-A-Plane Corp. v. United States*, 187 Ct. Cl. 269, 276 (1969) ("emphasizing that there is no mechanical or arithmetical answer" to the materiality inquiry). The SDD, however, discusses the offerors' proposals not for the purpose of establishing materiality based merely on the fact that the proposals addressed these deliverables, as CSI contends. Rather, the SDD cites the proposals to demonstrate how the offerors planned to provide the Three Core Deliverables during performance and, therefore, how removing these deliverables will impact the offerors' pricing and technical solutions. *See, e.g.*, AR 950 ("Octo discusses dedicating [ISSOs] to ELFF applications including '. . . maintaining the existing [ISP].'" (italicization omitted) (quoting AR 349)); *id.* (CSI "propose[s] the utilization of personnel to '. . . implement various metrics such as user satisfaction, error rates, request rate, average response time, and more.'" (italicization omitted) (quoting AR 246–47)). After analyzing how removing the Three Core Deliverables would impact the offerors' pricing and technical solutions, the CO concluded that "[c]ombined, these three CDRLs represented recurring deliverables requiring specialized staff and labor hours . . . that contractors included in their proposals but would never actually need." AR 951. The CO, therefore, properly considered both the qualitative and quantitative impact of removing these deliverables and reasonably concluded that removal of the Three Core Deliverables constitutes a cardinal change.

CSI also argues that the 2025 Bridge PWS "belies GSA's assertion that the removal of these items from the PWS was sufficiently significant to warrant termination of CSI's contract." ECF No. 75 at 34–36. CSI contends that the 2025 Bridge PWS contradicts GSA's assertion of materiality because, even though it post-dates the D&F Memo and the Agency's determination

40

that the PWS was outdated, it includes all the outdated PWS requirements and deliverables. *Id.* CSI's argument ignores that GSA issued the 2025 Bridge Task Order to avoid a gap in services and maintain the status quo during the pendency of this bid protest. *See* ECF No. 76-1 ¶¶ 4, 8–9. Given this purpose, it is unsurprising that GSA would not implement PWS changes that would impact the incumbent's proposed pricing and technical solution.

The contracting officer for the 2025 Bridge Task Order, Mr. Miller, explained that the bridge contract was issued "to avoid a lapse in coverage" utilizing a sole-source exception because "[t]he agency's need for the supplies or services [was] so urgent that providing a fair opportunity [for competition] would [have] result[ed] in unacceptable delays." *Id.* ¶ 4 (citing Federal Acquisition Regulation 16.505(b)(2)(i)(A)). Mr. Miller further explained that the 2025 Bridge PWS "did not reflect substantive changes to the outdated PWS" because the Agency was concerned that without the award, "a lapse in coverage was going to happen." *Id.* ¶ 8. While "the services were not exactly what [the Air Force] and GSA were trying to get to[,] . . . [the 2025 Bridge Task Order] staved off the lapse in coverage and provided bare minimum support to [the Air Force] until the [ ] protested task order could be recompeted with accurate and updated requirements." *Id.* Mr. Miller noted that "[h]ad the desired substantial changes . . . been incorporated into the [2025 Bridge PWS], the amount of time it would have taken the incumbent . . . to accurately [propose] the specifications in the PWS would have increased substantially, ultimately causing [a] lapse in coverage." *Id.* ¶ 9.

The Court finds Mr. Miller's explanation reasonable. *See Safeguard Base Operations, LLC v. United States* ("*Safeguard I*"), 140 Fed. Cl. 670, 704 (2018) (observing that "negotiat[ing] pricing and other terms with a potential bridge contract awardee" could lead to a lapse in services). Since the purpose of a bridge contract is generally to continue the current status quo, it would be

unusual for a bridge contract to incorporate such substantial changes. *See, e.g.*, *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1316 (Fed. Cir. 2025) (explaining that a bridge contract was issued "to maintain an adequate fuel supply to [] two military installations while" obtaining necessary approvals from local authorities (internal quotation marks and citation omitted)); *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 387 (2013) (explaining that a bridge contract was issued "to assure uninterrupted, continued foodservice support to the subject customers . . . until the follow-on contractor complete[d] transition"). Thus, the omission of the changes identified in the SDD from the 2025 Bridge PWS does not undermine their materiality; instead, it reflects the nature of the 2025 Bridge Task Order issued as a stop-gap measure to avoid a lapse in services.

In sum, the SDD coherently and reasonably explains why removal of the Three Core Deliverables constitutes a cardinal change justifying termination and re-solicitation. This justification alone is sufficient to uphold the Agency's decision. *See Dell*, 906 F.3d at 991 ("[C]orrective action only requires *a* rational basis for its implementation." (emphasis added)).

> 2.   The SDD's Discussion of the Remaining PWS Changes Does Not Rely on Impermissible Post-Hoc Rationalization.

In addition to the elimination of the Three Core Deliverables, the SDD also identifies several other changes that must be made to the outdated PWS to accurately reflect the Air Force's requirements. Contrary to CSI's argument, *see* ECF No. 75 at 36–39, the SDD's discussion of these remaining PWS changes does not constitute post-hoc rationalization. The discussion provides an amplified articulation of the reasons for termination and re-solicitation set forth in the D&F Memo as opposed to a new and independent explanation.

In *Department of Homeland Security v. Regents of the University of California*, the Supreme Court explained that, where a court remands to an agency because the grounds for the

42

agency's decision were inadequately explained, the agency may either (1) "offer a fuller explanation of the agency's reasoning *at the time of the agency action*," or (2) "deal with the problem afresh by taking *new* agency action." 591 U.S. 1, 20–21 (2020) (emphasis in original) (internal quotation marks and citations omitted). If the agency chooses "to elaborate on the reasons for the initial [decision] rather than take new administrative action [it is] limited to the agency's original reasons." *Id.* at 21. The agency's explanation "'must be viewed critically' to ensure that the [agency decision] is not upheld on the basis of impermissible '*post hoc* rationalization.'" *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 107 (1977)). While an agency may "provide an 'amplified articulation' of a prior 'conclusory' observation," *id.* at 20 (quoting *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5–6 (D.C. Cir. 2006) (Garland, J., concurring)), the agency's decision may not rely on "separate and independently sufficient reasons" that "bear[] little relationship" to those offered at the time of the agency action, *id.* at 21–22. The rule against post-hoc rationalization "promotes agency accountability by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority" and "instills confidence that the reasons given are not simply convenient litigating positions." *Id.* at 22–23 (internal quotation marks and citations omitted). Indeed, "[p]ermitting agencies to invoke belated justifications, . . . can upset the 'orderly functioning of the process of review,' forcing both litigants and courts to chase a moving target." *Id.* at 23 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, (1943)).

In *Regents*, the Supreme Court considered a legal challenge to the Department of Homeland Security's ("DHS") decision to rescind the Deferred Action for Childhood Arrivals ("DACA") policy, which had allowed "certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal." *Id.* at 8–9. Comparing the original

agency memorandum announcing the recission to the supplemental agency memorandum submitted on remand to provide further explanation, the Supreme Court held that the later justification for DHS's rescission decision contained impermissible post-hoc rationalization. *Id.* at 22. The Court noted that the original memorandum "rested the rescission on the conclusion that DACA is unlawful. Period." *Id.* The subsequent memorandum, however, "offered three separate and independently sufficient reasons for the rescission, only the first of which is the conclusion that DACA is illegal." *Id.* (internal quotation marks and citation omitted). The second reason in the later memorandum was that "DACA is, at minimum, legally *questionable* and should be terminated to maintain public confidence in the rule of law and avoid burdensome litigation." *Id.* (emphasis in original). The Court observed that while legal uncertainty is "related to illegality . . . the two justifications are meaningfully distinct." *Id.* The Court explained that "[w]hile an agency might, for one reason or another, choose to do nothing in the face of uncertainty, illegality presumably requires remedial action of some sort." *Id.* The later memorandum's third basis for the recission focused on policy reasons that were similarly absent from the agency's original explanation. *Id.*

The United States Court of Appeals for the Federal Circuit recently questioned the applicability of "the *Regents* framework" in the context of evaluating agency procurement decisions. *See Syneren Techs. Corp. v. United States*, 166 F.4th 1040, 1045 (Fed. Cir. 2026) (declining to extend "the *substantive and procedural* requirements of the APA that govern agency rulemaking," as articulated by *Regents*, to agency procurement actions (emphasis in original)). The facts of *Syneren* are distinguishable, as the procuring agency there took voluntary corrective action and issued new awards. *See id.* (holding that the new awards constituted new agency action). The agency did so unilaterally during litigation rather than following a remand by the trial

44

court. *See id.* Here, the Agency is not purporting in the SDD to take new agency action; it has only provided—at the Court's direction following remand—further explanation to support its termination and re-solicitation decision as set forth in the D&F Memo. *See CSI I*, 177 Fed. Cl. at 400–01 (remanding to GSA for further explanation). Thus, whereas *Regents* was inapposite to the circumstances in *Syneren*, it is directly controlling here.

The Court notes, however, that it is unclear whether, by referencing the "*Regents* framework," the Circuit intended to hold that the principles of APA review discussed in *Regents*— *i.e.*, a court's authority to order an agency to provide further explanation for its decision and, if so, the permissible scope of such explanation—are wholly inapplicable to judicial review of bid protests. As the Circuit noted, pursuant to the Tucker Act, the Court of Federal Claims reviews bid protests under the APA standard of review. *Syneren*, 166 F.4th at 1045 (citing 28 U.S.C. § 1491(b)(4)). The *Regents* framework pertains directly to that standard and is an articulation of "a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). *Regents*' application of the standard was not influenced by the APA's substantive or procedural rulemaking requirements. Rather, the *Regents* majority made clear that the prohibition on post-hoc justifications applies broadly to agency officials regardless of the type of agency action under review. *See id.* at 23 & n.3 (rejecting argument in Justice Kavanaugh's concurrence that requiring a contemporaneous explanation, which the majority called a "basic principle" of APA review, applies only to agency adjudications). Moreover, the agency decision at issue in *Regents* was not issued in the context of notice and comment rulemaking, nor did the Supreme Court consider whether it violated rulemaking requirements. *See id.* at 23 n.1 ("Plaintiffs also raised notice and comment claims, which uniformly failed below . . . .

45

Those claims are not before us."). The discussion of rulemaking in *Regents* referred only to prior related policies, including the DACA policy that the decision at issue rescinded. *See, e.g.*, *id.* at 11–12 (summarizing Fifth Circuit decision holding that Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") likely violated notice and comment requirement and was contrary to immigration statute), 26 (same), 55–56 (Thomas, J., concurring in part and dissenting in part) (opining that DACA violated notice and comment requirement). That discussion was relevant only to understanding the substantive grounds of the agency's recission decision, which was based, in part, on the Attorney General's opinion that DACA was unlawful and shared the same legal defects as DAPA. *See id.* at 10–13.

Ultimately, the Court does not interpret the Circuit's reference to the "*Regents* framework" as eliminating in bid protest cases either a court's authority to order further explanation or the applicability of the post-hoc rationale doctrine, as doing so would conflict with prior panel decisions directly applying those fundamental principles of APA review to agency procurements. *See, e.g.*, *Impresa*, 238 F.3d at 1338–39; *DynCorp*, 10 F.4th at 1316; *SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *5 (Fed. Cir. Oct. 12, 2023) (affirmatively citing *Regents*). To the extent there is a conflict, the Court is bound to follow the earlier panel decisions unless and until they are overruled by the Circuit sitting en banc, a statute, or a subsequent Supreme Court decision. *See Hensley v. West*, 212 F.3d 1255, 1261 (Fed. Cir. 2000) (citing *South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982)); *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005).

In the bid protest context, courts have found (both pre- and post-*Regents*) that "explanatory materials that do not offer new rationales for past decisions," but instead "illuminate the methodology the agency employed in making its determination," do not constitute post-hoc

46

rationalization. *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011), *aff'd*, 484 F. App'x 558 (Fed. Cir. 2012); *see also CS 321 E. 2nd Invs., LLC v. United States*, 178 Fed. Cl. 471, 495 n.20 (2025) (finding "[s]tatements made by the contracting officer during litigation" did not constitute post-hoc rationalization because "they merely provide more context about a concept—efficiencies—that was already in the record"); *BWhit Infrastructure Sols., LLC v. United States*, No. 23-813C, 2023 WL 7179267, at *5 (Fed. Cl. Oct. 31, 2023) (holding that the agency's justification did not constitute improper post-hoc rationalization because the justification was consistent with contemporaneous emails); *Harmonia Holdings Grp., LLC v. United States*, No. 21-1704C, 2022 WL 402399, at *3 (Fed. Cl. Jan. 25, 2022) (holding that a memorandum further explaining the agency's cancellation decision "[did] not appear to introduce *new* reasons for the cancellation and merely tie[d] those parts of the Administrative Record together" (emphasis in original)); *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 516–17 (2021) (holding that the agency's statements regarding its intent to limit corrective action were consistent throughout the administrative record).

CSI claims that the SDD's discussion of the remaining PWS changes—which include (1) the modification of seven other deliverables; (2) the removal of the General Ledger requirement; and (3) the introduction of new requirements based on both the shift in software platforms and the change in regulatory requirements for cybersecurity credentials—relies on impermissible post-hoc rationalization. *See* ECF No. 75 at 36–38. According to CSI, the D&F Memo relied only on "'remov[al]' of unspecified CDRLs." *Id.* at 37 (alteration in original) (quoting AR 773). CSI's argument, however, rests on an overly narrow reading of the D&F Memo.

The D&F Memo offered four principal reasons for GSA's termination and re-solicitation decision: (1) "the PWS is outdated," (2) "revisions to the CDRLs/Deliverables need to be made,"

47

(3) "certifications requirements were not clearly identified and carried over to the RFQ," and (4) "[a]mbiguities [were] found within the [RFQ]." AR 773 (listing "Reasons for Issuing a Termination for Convenience"). The SDD's discussion of modifying certain deliverables, removing the General Ledger requirement, and introducing new PWS requirements reflects an amplified articulation of the D&F Memo's explanation that "the PWS is outdated" and "revisions to the CDRLs/Deliverables need to be made." *Id.* The D&F Memo did not list these reasons for termination and re-solicitation in a vacuum. In describing the context for its reasoning, GSA explained that "[d]uring the re-evaluation, questions regarding the RFQ and PWS [were] discussed." *Id.* These questions arose regarding the following aspects of the RFQ and PWS: "Mandatory Requirements, Past Performance Evaluation, Required Certifications, and Deliverables." *Id.* Given this context, the Agency's rationale that "the PWS is outdated" logically could include changes such as the modification, removal, and introduction of both "Mandatory Requirements" and "Deliverables." *Id.* Similarly, the rationale that "revisions to the CDRLs/Deliverables need to be made" logically could include the modification of "Deliverables." *Id.*

CSI argues that the D&F Memo's reasoning was limited to the removal of deliverables because in the "Findings" section of the D&F Memo the CO specifically stated that "areas within the PWS . . . would need to be revised to remove deliverables/CDRLs," ECF No. 75 at 37–38 (emphasis omitted) (quoting AR 773), and in the "Determination" section the CO stated that "GSA intends to 'revise the outdated PWS' . . . 'to remove certain deliverables and [CDRLs],'" ECF No. 87 at 8:7–10 (quoting AR 774). But neither statement appears to be intended to limit the Agency's broader reasoning in the D&F Memo that the PWS is outdated and needs to be revised, including changes to the "Mandatory Requirements" and "Deliverables." *See* AR 773. Rather, the

48

statements provide examples of how the outdated PWS needs to be revised. The SDD's discussion of modifying deliverables and removing and introducing requirements thus "provide[s] more context about a concept . . . that was already in the record." *CS 321*, 178 Fed. Cl. at 495 n.20; AR 773–74. Unlike in *Regents*, 591 U.S. at 22, where the reasoning that DACA is illegal was "meaningfully distinct" from the reasoning that DACA's legality is questionable, here, the remaining reasons offered by the Agency—the modification of seven other deliverables, removal of the General Ledger requirement, and introduction of new requirements—are not "meaningfully distinct" from the D&F Memo's explanation that the PWS is outdated.

This conclusion is also consistent with the Court's previous decision and the scope of the remand order, as the Government aptly argues. *See* ECF No. 77 at 11 (citing *CSI I*, 177 Fed. Cl. at 397–401). In its previous opinion, the Court concluded "that the D&F Memo did not identify which portions of the PWS were outdated and which deliverables or requirements needed to be revised." *CSI I*, 177 Fed. Cl. at 398 (citing AR 773). Thus, the Court could not "assess what exactly was wrong with the Solicitation, how the Agency's needs necessitated revision, and how the proposed revisions would address its concerns." *Id.* at 399 (citing *Impresa*, 238 F.3d at 1333). Accordingly, the Court remanded to GSA for a fuller explanation of the Agency's termination and re-solicitation decision, including "which deliverables or requirements needed to be revised." *Id* at 398. As is clear from the opinion and order, the Court did not consider the D&F Memo's discussion of the PWS changes as strictly limited to removing deliverables. Instead, the remand opinion reflects that the D&F Memo's broader explanation that "portions of the PWS were outdated" and certain "deliverables or requirements needed to be revised" was not adequately explained. *Id.* at 398. The SDD's discussion of the modified deliverables as well as the removed and introduced requirements aligns with the Court's instructions.

Even if the D&F Memo could be read as limited only to the removal of deliverables, the modified deliverables and removed and introduced requirements discussed in the SDD bear a direct relationship to the removed deliverables discussed in the D&F Memo. Where the Agency has explained that the PWS needs to be revised to remove outdated deliverables, *see* AR 774, it is only logical that GSA would need to replace those outdated deliverables with updated deliverables and associated requirements. Further, modifying a deliverable is logically equivalent to removing an outdated deliverable and replacing it with an updated one. Since the modified deliverables and removed and introduced requirements discussed in the SDD bear a direct relationship to the removed deliverables, there is no post-hoc rationalization.

In sum, whether analyzed in relation to the D&F Memo's broader explanation for termination and re-solicitation or CSI's narrower reading, the SDD's discussion of the modified deliverables and the removed and introduced requirements does not reflect separate and independent reasons that bear little relation to the reasons GSA offered at the time of the challenged action. Either way, the SDD's discussion of the remaining PWS changes is an "amplified articulation," *Regents*, 591 U.S. at 20, of the D&F Memo's conclusion that the outdated PWS necessitated termination and re-solicitation.

3.    The SDD Reasonably Explained the CO's Determination that the Remaining PWS Changes Were Material.

Having determined that the remaining PWS changes discussed in the SDD do not constitute post-hoc rationalization and fall within the appropriate scope of remand, the Court concludes that the Agency reasonably assessed the materiality of these changes. The SDD explains six different categories of changes that, in addition to the removal of the Three Core Deliverables, demonstrate why the necessary revisions to the PWS could not be implemented absent termination and re-solicitation.

First, the CO explains that seven CDRLs "were modified to accept 'equivalent electronic form(s)' rather than formal documentation, substantially reducing the originally priced administrative effort." AR 951. Yet the offerors' proposals based the pricing on the original scope of the administrative effort. *Id.*

Second, the SDD describes how eliminating BEA and SFIS compliance "removes the requirement for transactions to align with the United States Standard General Ledger." *Id.* Analyzing both the qualitative and quantitative impact of removing this requirement, the SDD explains that "[t]his deletion eliminates an entire compliance framework contractors built into their technical approaches and pricing." *Id.* This meant that the existing proposals included compliance requirements that the Air Force no longer needed. *Id.*

Third, the CO notes that "the PWS introduces significant new requirements," which include "Apache/IIS systems and cloud infrastructure expertise (Azure/AWS) . . . ; administration of the complete Atlassian Tools Suite (Jira, Confluence, BitBucket, Fisheye) . . . ; and database restart/recovery procedures." *Id.* In describing the effect of these changes, the SDD explains that "the shift from enterprise-focused ServiceNow to the more accessible Jira platform lowers barriers for smaller contractors while expanding required platform expertise." *Id.* The existing proposals were instead based on the ServiceNow platform and IT infrastructure requirements that no longer reflect the Air Force's actual needs. *Id.*

Fourth, the CO describes the elimination of "manual security documentation," which will be replaced by the requirement that contractors use eMASS instead. *Id.* Evaluating the impact of this change, the SDD notes that eMASS "demands specialized training to navigate its security authorization tools, controls scorecard measurement, and dashboard reporting." *Id.* The existing

51

proposals, however, do not include such training. *See* AR 955 (explaining that the "addition of new database operations procedures directly impacted FTE allocations and cost structures").

Fifth, the CO explains that the regulatory framework "evolved" from AFMAN 17-1303 to DAFMAN 17-1305, which "mandates alignment with the [DCWF]." AR 952. In describing the effect of this change, the SDD explains that "DCWF personnel must be certified before their first day of contract work, with contractors bearing full responsibility for all training and certification costs." *Id.* But again, this certification is not contemplated in the existing proposals. *See id.* (explaining that the offerors "structured teams and pricing for requirements that no longer exist while lacking resources for new requirements they had no opportunity to propose").

Sixth, the CO notes that all these PWS changes are compounded by additional modifications. *Id.* The SDD explains that "[t]ogether, these revisions create a fundamentally different solicitation from what contractors originally bid on." *Id.* Because "[t]hese changes directly impact [FTE] allocations, labor estimates, and cost proposals . . . [t]he gap between what was originally required and what is actually needed prevents any fair evaluation of current proposals." *Id.*; *see also* AR 956 (concluding that the "technical requirements had evolved so substantially that proposed solutions no longer aligned with Government needs").

As with the Three Core Deliverables, here too the CO reasonably assessed the materiality of the remaining PWS changes discussed in the SDD. The CO considered the qualitative and quantitative impact of these changes, both individually and cumulatively, on the offerors' pricing and technical solutions and concluded that the necessary revisions amount to cardinal changes. *See* AR 951–56; *AT&T*, 1 F.3d at 1205; *Saddler*, 152 Ct. Cl. at 561; *Wunderlich*, 173 Ct. Cl. at 194. Thus, the SDD offers a reasonable explanation for the CO's determination that the remaining PWS changes are material.

52

CSI's various arguments to the contrary, *see* ECF No. 75 at 38, are unpersuasive. For example, CSI claims in its motion that "the seven deliverables" in need of updating "to reflect the Air Force's transition from formal documentation to electronic formats" are "minor adjustments" for which the SDD provides no reason to believe are material. *Id.* The SDD does, however, provide a reason for why these changes constituted a cardinal change. The SDD states that the modification to accept "'equivalent electronic form(s)' rather than formal documentation" for seven CDRLs "substantially reduc[es] the originally priced administrative effort." AR 951. At oral argument, CSI's counsel responded by challenging the Agency's determination that these changes were material based on counsel's own experience in shifting from paper to electronic documentation. ECF No. 87 at 22:1–23:13. Such an argument invites the type of second-guessing that this Court must refrain from engaging in when reviewing an agency's reasonable exercise of discretion.[9] *See DynCorp*, 10 F.4th at 1311.

CSI also alleges that the CO's "assertion that the PWS' outdated use of a general ledger unfairly advantaged Octo Metric . . . reflects paradigmatic arbitrary and capricious reasoning." ECF No. 75 at 38. In CSI's view, the Agency cannot reasonably explain why "in order to ensure that CSI will not be prejudiced by Octo Metric's unfair advantage, GSA proposes to *further and irreparably prejudice* CSI by taking away its contract." *Id.* (emphasis in original). But this is not

---

[9] CSI also suggested that there could be no material impact on price because the deliverables at issue were firm-fixed-price deliverables. ECF No. 87 at 39:4–40:10. It is not clear to the Court how the pricing structure for these deliverables undermines GSA's determination of materiality. The SDD explains that the offerors included in their technical solutions and pricing certain requirements that the Government no longer needs. *See* AR 955. The Government, therefore, would necessarily be paying for these outdated requirements as part of paying the offerors' firm-fixed prices. It seems only logical that, were these requirements removed, the offerors may change their firm-fixed prices in response. Indeed, it appears that is what the SDD contemplates. *See* AR 952 (Because "[t]hese changes directly impact [FTE] allocations, labor estimates, and cost proposals . . . [t]he gap between what was originally required and what is actually needed prevents any fair evaluation of current proposals.").

the purpose for which the CO notes the example. Instead, the CO cites Octo Metric's proposal to explain how the removal of the General Ledger requirement will impact the offerors' overall pricing and technical solutions. *See* AR 951 ("By not addressing the US Standard General Ledger requirement in their proposal, Octo gained additional space to elaborate on other technical aspects[.]"); *see also id.* (noting in the same discussion that CSI's inclusion of the General Ledger requirement "demonstrates how CSI allocated labor hours and personnel to requirements that are no longer needed"); AR 952 (concluding that "as evident in the examples provided above for Octo and CSI, [the offerors] structured teams and pricing for requirements that no longer exist while lacking resources for new requirements they had no opportunity to propose"). Overall, therefore, the SDD reasonably analyzed the impact of removing the General Ledger requirement, explaining that "[t]his deletion eliminates an entire compliance framework contractors built into their technical approaches and pricing." AR 951.

CSI further challenges the Agency's determination that the transition from AFMAN 17-1303 to DAFMAN 17-1305 constitutes a material change. ECF No. 75 at 38 n.4. CSI asserts that "the SDD does not explain the materiality of this change in manuals," because "GSA does not allege that either the PWS or the personnel proposed by CSI do not comply with the standards required under DAFMAN." *Id.* (citing AR 952). CSI is mistaken. The SDD does describe the effect of the regulatory change by noting that DCWF personnel must now "be certified before their first day of contract work, with contractors bearing full responsibility for all training and certification costs." AR 952. The Agency's determination that compliance with stricter regulatory requirements will lead to material changes in the offerors' pricing and technical solutions is, on its face, reasonable. *See United States v. Winstar Corp.*, 518 U.S. 839, 883 (1996) (acknowledging that "all regulations have their costs"); *IBI Sec. Serv., Inc. v. United States*, 19 Cl. Ct. 106, 108–10

54

(1989) (distinguishing contracts where the parties had contracted to share the risk of cost increases resulting from certain regulatory changes), *aff'd*, 918 F.2d 188 (Fed. Cir. 1990).  CSI has not shown that to reach a rational conclusion GSA was required to make an explicit determination as to whether the PWS and CSI's proposal complied with the updated, and stricter, requirements.  The Court declines CSI's invitation to second guess the Agency's reasonable determination.

As for the remaining PWS changes—*i.e.*, the shift from ServiceNow to Jira and the introduction of the eMASS system—CSI does not offer any specific argument for why the SDD's materiality determinations were unreasonable.  Having reviewed the Agency's assessment of the materiality of these changes, the Court finds them to be reasonable.  *See* AR 951 (describing how the "shift" from ServiceNow to Jira "lowers barriers for smaller contractors while expanding required platform expertise"); *id.* (explaining that the introduction of the eMASS system "demands specialized training to navigate its security authorization tools, controls scorecard measurement, and dashboard reporting").

Finally, CSI also relies on the 2025 Bridge PWS to challenge the materiality of the PWS changes it asserts amount to post-hoc rationalization.  ECF No. 75 at 38–39.  For the same reasons discussed regarding the removal of the Three Core Deliverables, CSI's argument is unavailing. *See supra* § III.D.1.  As Mr. Miller explained, the 2025 Bridge PWS was issued as a stop-gap measure to avoid a lapse in services.  ECF No. 76-1 ¶¶ 4, 8–10.  Thus, the Agency reasonably determined that including these remaining PWS changes in the 2025 Bridge PWS, which was itself an interim solution, posed an unacceptable risk of a lapse in services.  *Id.*  Their omission, accordingly, does not undermine GSA's determination that the remaining PWS changes constitute cardinal changes.

\*       \*       \*

The SDD reflects the CO's reasonable determination that the outdated PWS required numerous material changes and that any attempt to implement the changes through targeted solicitation amendments and evaluation of the offerors' existing proposals would undermine fair competition in violation of the cardinal change doctrine. Given the CO's explanation of the various PWS changes, as well as analysis of the impact these changes (both individually and cumulatively) would have on the offerors' proposals, the Court concludes that the CO coherently and reasonably explained GSA's decision to terminate CSI's award and re-solicit the Air Force's ELFF requirement under a revised solicitation.

### E.       GSA Did Not Breach the Implied Duty of Good Faith and Fair Dealing.

CSI fails to meet its burden to demonstrate that the Agency breached the covenant of good faith and fair dealing by providing a pretextual rationale for its termination and re-solicitation decision. Having based its claim on an allegation of pretext, ECF No. 75 at 41–44, CSI must prove its allegation by clear and convincing evidence. CSI's sole piece of evidence, however, is the 2025 Bridge PWS's omission of the PWS changes discussed in the SDD, and the Agency has convincingly rebutted the allegations with an innocuous explanation for why the 2025 Bridge PWS does not reflect these changes.

### 1.       CSI Must Establish Its Allegation of Pretext by Clear and Convincing Evidence.

As an initial matter, the parties disagree over the burden CSI bears to prove its second count. CSI argues that its claim should be analyzed under the familiar APA standard because the Federal Circuit has held that a breach of the implied duty of good faith and fair dealing can be established under the arbitrary and capricious standard of review. *Id.* at 43–44. The Government, on the other hand, argues that CSI cannot prove an allegation of pretext, which the Government contends is equivalent to bad faith, without clear and convincing evidence. ECF No. 77 at 12. The

Court agrees with the Government. CSI cannot circumvent the clear and convincing evidence standard applicable to allegations of pretext by making its pretext argument under a claim of breach of the covenant of good faith and fair dealing.

Bad faith and pretext are "one and the same in the context of a bid protest challenging a cancelation decision." *CSI III*, 173 Fed. Cl. at 487 (citing *BAE Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 238 (2022); *Irwin County v. United States*, 170 Fed. Cl. 355, 369–71 (2024); *Klinge Corp. v. United States*, 87 Fed. Cl. 473, 479–80 (2009); *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 41 (2010); and *Seventh Dimension*, 160 Fed. Cl. at 32). CSI's attempts to distinguish its allegation of pretext from allegations of bad faith, *e.g.*, ECF No. 75 at 8, are therefore futile.

CSI is correct that a breach of the implied duty of good faith and fair dealing, including in the context of an agency's cancellation decision, generally can be established under the arbitrary and capricious standard of review. *See id.* at 43–44 (citing *Safeguard Base Operations, LLC v. United States* ("*Safeguard II*"), 989 F.3d 1326, 1332 (Fed. Cir. 2021)). CSI is wrong, however, in claiming it can establish pretext without clear and convincing evidence. *Id.* at 44. The Federal Circuit in *Syneren* recently rejected a similar argument advanced by CSI. *See* 166 F.4th at 1046. In *Syneren*, CSI, as an unsuccessful offeror for an IT-services contract, argued that the procuring agency had breached the duty of good faith and fair dealing because the agency's corrective action, including its re-evaluation of CSI's proposal, was designed to reach a "predetermined result." *Id.* (internal quotation marks and citation omitted). Like here, CSI expressly claimed that it "ha[d] not alleged bad faith." *Id.* In addressing this argument, the Federal Circuit noted that a protestor must offer "clear and convincing evidence" to "overcome the presumption of good faith on behalf of the government." *Id.* (quoting *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330

(Fed. Cir. 2004)). Ultimately, the Federal Circuit found "CSI's unsupported argument that the agency's corrective action was not genuine" failed to meet that standard. *Id.*

Similarly, in *27-35 Jackson Ave LLC v. United States*, where the plaintiff alleged that the agency's rationale for terminating its lease was pretextual, the Federal Circuit rejected the plaintiff's "attempt to distinguish its claim from a claim of bad faith" and affirmed the Court of Federal Claims' holding that the plaintiff failed to establish its allegation of pretext by clear and convincing evidence. 127 F.4th 1314, 1323–24 (Fed. Cir. 2025). This Court is bound by the Federal Circuit's precedent requiring that a plaintiff establish its claim of breach of the covenant of good faith and fair dealing through clear and convincing evidence, at least insofar as that claim is based on bad faith or pretext. *Garner v. United States*, 85 Fed. Cl. 756, 762 (2009) ("[T]he law of the Federal Circuit is binding upon this court[.]").

The cases that CSI cites do not disturb this conclusion. *See* ECF No. 75 at 43–44. For example, *Metcalf Construction Co. v. United States* held that the trial court took an improperly narrow view of the duty of good faith and fair dealing, requiring proof of a bait-and-switch or specific targeting to prove a breach. *See* 742 F.3d 984, 992–94 (Fed. Cir. 2014). But *Metcalf* did not purport to address the evidentiary standard of proof for a claim of breach of the implied duty of good faith and fair dealing where the basis of the alleged breach is that the Government acted pretextually. Similarly, while *Safeguard II* held that claims of breach of the implied duty of good faith and fair dealing can be reviewed under the arbitrary and capricious standard, it did not address how such claims should be analyzed when they are based on allegations of bad faith. *See* 989 F.3d at 1332.

Moreover, as the Government correctly argues, ECF No. 85 at 14–15, CSI improperly relies on both *Seventh Dimension*, 160 Fed. Cl. at 32, which held that the protestor failed to satisfy

the standard of proof for establishing pretext, and *MORI Associates, Inc. v. United States*, 102 Fed. Cl. 503 (2011), which noted that it was "unnecessary to consider [the protestor's] allegations of bad faith or pretext," *id.* at 554 n.61.  Neither case held that a protestor could prove pretext under an arbitrary and capricious standard.  To the contrary, in *Seventh Dimension*, the court evaluated the protestor's pretext allegation against the "well-nigh irrefragable proof" standard, 160 Fed. Cl. at 33 (quoting *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013)), for demonstrating "that the government officials did not act in good faith," *id.*  In *MORI*, the court did not address the protestor's allegations of pretext and to the extent the court did discuss the standard appropriate to such allegations, it noted that "it is bound by precedent applying the clear and convincing evidence standard in the context of bid protests."  102 Fed. Cl. at 543 n.45 (citing *Galen Med. Assocs.*, 369 F.3d at 1330).  To establish pretext, therefore, CSI must provide clear and convincing evidence.

> 2. <u>CSI Does Not Offer Clear and Convincing Evidence that the Agency's Stated Rationale Was Pretextual.</u>

CSI has not demonstrated pretext by clear and convincing evidence.  It bases its allegation entirely on the 2025 Bridge PWS's omission of the PWS changes discussed in the SDD.  ECF No. 75 at 41–44.  In CSI's view, GSA's issuance of the 2025 Bridge PWS omitting the PWS changes described in the SDD, "nearly one year after GSA allegedly discovered" that the PWS was outdated, "exposes the reality that GSA's termination and cancellation decisions . . . are merely pretextual."  *Id.* at 42.

However, Mr. Miller, the contracting officer for the 2025 Bridge Task Order, explained that the bridge contract was issued to avoid "a lapse in coverage" and therefore "did not reflect substantive changes to the outdated PWS."  ECF No. 76-1 ¶ 8.  Although "the services were not exactly what [the Air Force] and GSA were trying to get to," the 2025 Bridge PWS "staved off the

lapse in coverage and provided bare minimum support to [the Air Force]" during the pendency of the protest. *Id.* Mr. Miller explained that incorporating the PWS changes into the 2025 Bridge PWS would "substantially" increase the amount of time it would take the incumbent to prepare its proposal, "ultimately causing [a] lapse in coverage" for the ELFF requirement. *Id.* ¶ 9. The Court finds GSA's innocuous explanation for the facts eminently reasonable. Namely, as a stop-gap measure to avoid a lapse in services, the 2025 Bridge Task Order award process did not allow time for the incumbent to propose the substantial changes that were identified in the outdated PWS. *See id.* ¶ 10.

CSI argues that Mr. Miller's explanation "simply does not pass the straight face test." ECF No. 84 at 30. Essentially, CSI argues that GSA had several months within which to obtain an updated proposal from the incumbent that could have incorporated the PWS changes discussed in the SDD. *Id.* The Court notes that it would make little sense for GSA to spend the time and effort necessary to obtain a responsive proposal incorporating these PWS changes when the Agency did not know how long the protest would last and was anticipating the use of a bridge contract as only a stop-gap measure. *See* ECF No. 76-1 ¶ 10 (indicating that the 2025 Bridge Task Order "was never intended to be a long-term contracting solution"); *see also Safeguard I*, 140 Fed. Cl. at 704 (observing that the time an agency must spend "negotiat[ing] pricing and other terms with a potential bridge contract awardee and . . . prepar[ing] and execut[ing] documentation justifying the award of a bridge contract" may lead to delays and a lapse in supplies or services). In any event, CSI's disagreement with the Agency's reasonable determination that implementing substantive changes in the 2025 Bridge Task Order would cause unacceptable delay and potentially a lapse in services falls short of the "well-nigh irrefragable" proof necessary to establish pretext.

*Am-Pro Protective Agency*, 281 F.3d at 1239–40.  As a result, CSI has not met its burden to establish its claim of breach of the covenant of good faith and fair dealing.

###### F.      CSI Is Not Entitled to Injunctive Relief.

The Court must deny CSI's request for permanent injunctive relief because CSI has not established success on the merits.  In determining whether to issue a permanent injunction, a court must consider whether: (1) "the plaintiff has succeeded on the merits of the case"; (2) "the plaintiff will suffer irreparable harm if the court withholds injunctive relief"; (3) "the balance of hardships to the respective parties favors the grant of injunctive relief"; and (4) "it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)).  "[I]t is well-established that a plaintiff that has not succeeded upon the merits of its claims cannot prevail upon a request for injunctive relief."  *Glocoms, Inc. v. United States*, 149 Fed. Cl. 725, 734 (2020); *see also Dell*, 906 F.3d at 999 n.13 (noting that where the protestor has not succeeded on the merits, "the great weight [] accord[ed] [to that] factor as compared to the other three precludes the possibility of an injunction").  CSI is not entitled to injunctive relief because it has not succeeded on the merits of its claims.

### IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Supplement and/or Complete the Administrative Record (ECF No. 72) is **GRANTED**, Plaintiff's Second Motion for Judgment on the Administrative Record (ECF No. 75) is **DENIED**, and the Government's Renewed Cross-

Motion for Judgment on the Administrative Record (ECF No. 77) is **GRANTED**.  The Clerk is directed to enter judgment accordingly.

       **SO ORDERED**.


Dated:  April 27, 2026                        */s/ Kathryn C. Davis*
                                       KATHRYN C. DAVIS
                                       Judge